UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on November 6, 2006

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 1:08-cr-274-ESH |
| | ) | |
| v. | ) | CRIMINAL VIOLATIONS: |
| | ) | |
| KEVIN A. RING, | ) | Count I: Conspiracy, 18 U.S.C. § 371 |
| | ) | |
| Defendant. | ) | Count II: Payment of a Gratuity, 18 U.S.C. §§ 201(c)(1)(A) and 2 |

Counts III–VIII: Honest Services Wire
Fraud, 18 U.S.C. §§ 1343, 1346, and 2

RETYPED **INDICTMENT**

**FILED**

OCT 0 1 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

The Grand Jury charges:

**COUNT I**
(Conspiracy)

1.     At all times material to this indictment:

**Relevant Entities Involved**

2.     Firm A was a law and lobbying firm with an office in Washington, D.C.  Firm A employed lobbyists who represented their clients before the United States Congress and various federal agencies, including those within the executive branch.  In January 2001, several of its lobbyists left the practice of Firm A and joined Firm B.

3.     Firm B was a law and lobbying firm with an office in Washington, D.C.  Firm B employed lobbyists who represented their clients before the United States Congress and various federal agencies, including those within the executive branch.  In or about February 2004, Firm B launched an internal investigation into the lobbying practices of several of its lobbyists.

4.     The United States Department of Justice (DOJ) is a department of the United States. DOJ consists of a number of divisions, including the Criminal Division, the Environment and Natural Resources Division, the Office of Intergovernmental and Public Liaison, the Office of Legislative Affairs, and various other federal entities, including the Immigration and Naturalization Service (INS) at times relevant to this indictment.  The Office of Justice Programs is an office within DOJ that handles certain types of federal grant applications.

5.     The Department of Interior (DOI) is a department of the United States.  The DOI consists of a number of different divisions and bureaus.  The Bureau of Indian Affairs is a bureau within the DOI that handles aspects of Native American tribal matters.

6.     The New Mexico tribe is a Native American Indian tribe based in New Mexico.  In or about March 2002, the New Mexico tribe hired Firm B to provide lobbying services to the tribe.

### Relevant Individuals Involved

7.     From in or about November 1993 to in or about 1998, defendant KEVIN A. RING worked as a staff member in the office of a Member of the U.S. House of Representatives (Representative 5).  During 1998, defendant RING worked for a subcommittee of the Senate Judiciary Committee.  During 1999, defendant RING served as executive director of a Republican caucus in the U.S. House of Representatives.

8.     From in or about 1994 to in or about 2004, Jack A. Abramoff was a Washington, D.C. lobbyist.  In or about 1994, Abramoff joined Firm A as a lobbyist.  In or about January 2001, Abramoff left Firm A and joined Firm B.  While at Firms A and B, Abramoff solicited and obtained lobbying business from groups and companies throughout the United States, including Native American tribal governments operating and interested in operating gambling casinos.  Abramoff

2

also coordinated and supervised the affairs and activities of a team of lobbyists that reported directly to Abramoff. Abramoff resigned from Firm B in or about March 2004 shortly after Firm B initiated an internal investigation into the lobbying practices of Abramoff and members of his lobbying team.

9.    In or about December 1999, defendant RING resigned from the Republican caucus of the U.S. House of Representatives to join Abramoff as a lawyer and lobbyist in Firm A's Washington, D.C. office. Abramoff was instrumental in defendant RING being hired by Firm A, and defendant RING began working at Firm A in or about December 1999, along with a team of other lobbyists directed by Abramoff. In or about January 2001, defendant RING followed Abramoff to Firm B as a lawyer and lobbyist. Defendant RING left the employment of Firm B in or about October 2004.

10.    Defendant RING and Abramoff solicited and obtained business throughout the United States, including with Native American tribal governments operating, and interested in operating, gambling casinos. Defendant RING and Abramoff, directly and through the team of lobbyists, sought to further their clients' interests by lobbying public officials, including Members of the U.S. House of Representatives and Senate, their staffs, and officials in the executive branch. At times, defendant RING, Abramoff, and other members of the lobbying team communicated with each other and their clients through interstate email and interstate telephone calls. Payments were often made by interstate wire transfer or checks that foreseeably caused interstate funds transfers between banks.

11.    Robert Ney served as the U.S. Representative for the 18th Congressional District in Ohio from in or about January 1994 until in or about September 2006. From in or about January 2001 until his resignation as Chairman in or about mid-January 2006, Ney served as the appointed

Chairman of the House Committee on Administration (the "House Administration Committee").

Beginning in or about January 2003, Ney also was the Chairman of the Housing and Community

Opportunity Subcommittee of the House Financial Services Committee.

12.     Neil Volz was the Communications Director and then Chief of Staff to Ney from in

or about January 1995 through in or about February 2002.  From in or about January 2001 until in

or about February 2002, Volz was also the Staff Director for the House Administration Committee.

In or about February 2002, Volz left the public sector and went to work with defendant RING and

Abramoff as a lobbyist at Firm B.

13.     William J. Heaton worked as Ney's Executive Assistant on the House

Administration Committee from in or about September 2001 until in or about February 2002.  In or

about February 2002, Heaton succeeded Volz as Ney's Chief of Staff.

14.     John Albaugh worked for a then-Member of the U.S. House of Representatives

(Representative 4) for approximately fourteen years, eventually rising to the position of Chief of

Staff and serving in that position from approximately 1998 until December 2006.  From in or about

January 2003 through in or about January 2005, Representative 4 served as the chairman of a

subcommittee of the U.S. House of Representatives Appropriations Committee before which

defendant RING's clients had pending and anticipated matters.  As Chief of Staff, Albaugh's

primary responsibilities included oversight of issues relating to the subcommittee, including

appropriations requests.

15.     Representative 5 serves as the Representative for a federal congressional district in

California.  Representative 5 has been serving that district since in or about 1993.  Representative 5

has long held an antigambling position.

4

16.     Robert E. Coughlin II worked for DOJ from in or about March 2001 until in or about April 2007 in various positions, including Special Assistant to the Assistant Attorney General for Legislative Affairs and Deputy Director of the Office of Intergovernmental and Public Liaison. Coughlin's duties generally included counseling DOJ on issues relating to other government agencies, outside organizations, and state and local elected officials; tracking certain DOJ matters before Congress; and serving as a liaison between DOJ and congressional staff members and others, including lobbyists, who had legislative issues impacting DOJ.

### Fiduciary Duties and Responsibilities

17.     Public officials within the legislative branch owe a fiduciary duty to the United States and its citizens to perform the duties and responsibilities of their offices free from deceit, fraud, concealment, bias, self-enrichment, and self-dealing.  In recognition of that fiduciary duty, the U.S. Senate and House of Representatives established certain rules relating to the public disclosure of financial information (the "financial-disclosure rules").  As a former congressional staffer, as well as through written guidance and training provided by Firms A and B, defendant RING was familiar with and aware of the financial-disclosure rules.

18.     Public officials within the executive branch also owe a fiduciary duty to the United States and its citizens to perform the duties and responsibilities of their offices free from deceit, fraud, concealment, bias, self-enrichment, and self-dealing.  Defendant RING was familiar with and aware of the financial disclosure rules through written guidance and training provided by Firms A and B.

5

## THE CONSPIRACY AND ITS OBJECTS

19.    From at least as early as January 2000 through at least October 2004, in the District of Columbia and elsewhere, the defendant,

### KEVIN A. RING,

did knowingly conspire and agree with Abramoff and others both known and unknown to the Grand Jury to commit the following offenses against the United States, that is,

A.    otherwise than as provided by law for the official discharge of duty, to give, offer and promise anything of value to certain public officials for and because of official acts performed and to be performed by such public officials, all in violation of 18 U.S.C. § 201(c); and

B.    to devise a scheme and artifice to defraud and deprive the United States and its citizens of their right to the honest services of certain public officials within the legislative and executive branches performed free from deceit, fraud, concealment, bias, self-enrichment, and self-dealing, and to use interstate wire communications for the purpose of executing the scheme and artifice to defraud, all in violation of 18 U.S.C. §§ 1343 and 1346.

### PURPOSE OF THE CONSPIRACY

20.    It was a purpose of the conspiracy for defendant RING and his coconspirators to obtain benefits, financial and otherwise, for themselves and their clients through corrupt means, including by offering and providing things of value to certain public officials to influence, to induce, to reward, and in exchange for official actions by those public officials.

21.    It was a further purpose of the conspiracy for defendant RING and his coconspirators to attempt to conceal from the public their offering and providing things of value to certain public

officials to influence, to induce, to reward, and in exchange for official actions, in order to facilitate and perpetuate the conspiracy.

## MANNER AND MEANS

22.     The manner and means of the conspiracy included but were not limited to the following:

23.     Defendant RING and his coconspirators identified public officials who could use their influence and positions to perform official actions that would assist defendant RING and his coconspirators in their lobbying efforts on behalf of their clients. Defendant RING and his coconspirators then attempted to groom those public officials by offering and providing things of value with the intent of making those public officials more receptive to requests for official actions on behalf of their clients in the future.

24.     Defendant RING and his coconspirators offered and provided things of value to certain public officials and others as a means of influencing, inducing, and rewarding official actions, and in exchange for official actions. These things of value included but were not limited to all-expenses-paid domestic and international travel, meals, drinks, golf, tickets to professional sporting events, concerts and other events, and employment opportunities to spouses of congressional members and staff. These things of value were often billed to defendant RING's and Abramoff's clients.

25.     Defendant RING and his coconspirators generally disbursed the things of value based upon the likelihood that a public official would take an official act on behalf of their clients and also based upon the influence used and official actions taken by the public officials on behalf of their clients. Generally, those public officials who tended to provide more official acts for

7

defendant RING and his coconspirators received a higher priority in the requests for the things of value than those who did not.

26.     Defendant RING and his coconspirators used the growing success of their lobbying practice, which had been built in part by corrupt means, to retain existing clients and attract future clients.

27.     In order to facilitate and perpetuate the conspiracy, defendant RING and his coconspirators attempted to conceal, concealed, and aided and abetted the concealment from the public and, to some extent, from their clients, their practice of providing things of value to certain public officials as a means of influencing and securing their official actions and rewarding those official actions. Defendant RING and his coconspirators at times filed expense reports seeking reimbursement from Firm B that attempted to conceal the true identity of the recipients of the things of value. Defendant RING and his coconspirators did so to reduce the likelihood that a public official would be identified as the true recipient of a thing of value, which could be in violation of the applicable financial disclosure rules. Defendant RING and his coconspirators understood that the public officials to whom they provided things of value were materially failing to report those items as gifts on their required financial disclosure forms and were filling out materially false financial disclosure forms.

28.     Defendant RING and his coconspirators employed these manner and means with the Office of Representative 4, the Office of Representative 5, the Office of Representative Ney, the DOJ, the DOI, and other congressional offices and executive branch entities.

## OVERT ACTS

29.     In furtherance of the conspiracy and to achieve its purposes, defendant RING,

Abramoff and other coconspirators committed at least one of the following overt acts, among

others, in the District of Columbia and elsewhere:

### Honest Services Fraud Relating to the Office of U.S. Representative 4

30.     On or about March 14, 2002, defendant RING emailed Albaugh, "You are going to

eat free off of our clients.  Need to get us some [client issue] money."

31.     On or about February 4, 2003, defendant RING offered and agreed to give Albaugh

three tickets for a concert by country-music artist George Strait.

32.     On or about March 10, 2003, defendant RING expensed lunch for Albaugh at the

Capitol Hill Club, one of many meals at various restaurants that defendant RING bought for

Albaugh and expensed back to Firm B.

33.     On or about March 13, 2003, Albaugh suggested that Representative 4 call Abramoff

to thank him in advance for the use of one of Abramoff's FedEx Field suites for an upcoming

fundraising event.

34.     On or about April 4, 2003, defendant RING gave Albaugh four suite tickets to a

concert by country-music artist Tim McGraw at the MCI Center, some of the many tickets for

entertainment events that defendant RING gave Albaugh free of charge.

35.     On or about April 10, 2003, defendant RING asked Albaugh to meet so that

defendant RING could review with Albaugh Firm B's clients' transportation appropriation requests.

Albaugh agreed to review the requests with defendant RING.

36.     On or about July 10, 2003, defendant RING expensed to Firm B the costs of dinner, including delivery charges, to Albaugh and other staffers who had been working late on the transportation appropriations bill.

37.     On or about July 11, 2003, Albaugh ensured that various projects benefiting defendant RING's and Firm B's clients received in total more than $4 million in a subcommittee draft of the transportation appropriations bill.

38.     On or about July 14, 2003, defendant RING emailed Abramoff that they had secured money for various clients in the transportation appropriations bill, including $2 million for the New Mexico tribe, and asked Abramoff to call Representative 4 to thank him for his "help with our client priorities in the" bill and say, "Your staff, especially John Albaugh, has been very responsive and helpful in working with Kevin Ring on our team."

39.     On or about July 24, 2003, after Albaugh emailed defendant RING and thanked him for buying lunch, defendant RING responded, "I am the man!!!!!  That was a good one."

40.     On or about July 29, 2003, defendant RING asked Albaugh to assist defendant RING in securing approximately $4,183,000 in funding for a road project benefiting one of defendant RING's clients, an appropriation that defendant RING, Representative 4, and Albaugh had discussed the night before during the American Idol concert.  Albaugh replied, "I don't think it will be a problem . . . ."

41.     On or about November 4, 2003, defendant RING sent Albaugh an email in which defendant RING wrote, "Now let's get that conference done so we can bring the bucks home!!!!!!!" Albaugh responded, "I [am] actually going thru the earmarks right now!"

42.    On or about November 11, 2003, Albaugh sent defendant RING an email in which Albaugh wrote, "[T]here will be something for [Client A]. About 1 million," referring to the transportation-appropriations bill.

43.    On or about November 12, 2003, defendant RING sent an email to Albaugh in which defendant RING asked Albaugh whether he was "[s]till conferencing" on the transportation appropriations bill. Albaugh responded, "Yes, it is helping your projects out."

44.    On or about November 12, 2003, after defendant RING sent a second email to Albaugh, asking Albaugh to inform him about any help that Albaugh had provided his clients in the conference on the transportation appropriations bill, Albaugh responded by email as follows:

> [Client A] is now at $1[.]25 m
> [Client B] $1 m
> [Client C] $1.2 m
> [Client D] $1.4 m
> Who[']s the man!

45.    On or about November 17, 2003, defendant RING and Albaugh agreed to meet for lunch at Oceanaire Restaurant so that defendant RING could talk about "trips and also potential OK [Oklahoma] clients."

46.    On or about November 17, 2003, as a result of their discussions at lunch, defendant RING sent Albaugh an email in which defendant RING offered suite tickets to Albaugh to an upcoming concert by The Wiggles and Washington Redskins football games on November 30, 2003 and December 14, 2003.

47.    On or about November 20, 2003, defendant RING sent Albaugh an email in which defendant RING confirmed that he would give to Albaugh four tickets to a professional horse show

on November 23, 2003 and reserve four suite tickets for the Washington Redskins game on
December 14, 2003.

48.      On or about November 30, 2003, defendant RING gave Albaugh five tickets to a
Washington Redskins game.

49.      On or about January 13, 2004, defendant RING sent Albaugh an email in which
defendant RING offered to host another fundraising dinner for Representative 4 and asked about a
bill in the U.S. Senate and Representative 4's office's relationship with the U.S. Department of the
Treasury.

50.      On or about January 13, 2004, in response to defendant RING's email, Albaugh sent
defendant RING an email in which Albaugh told defendant RING to give him a call and then asked
defendant RING if he had any tickets for an upcoming performance of Disney on Ice.

51.      On or about January 22, 2004, defendant RING gave Albaugh four suite tickets to
Disney on Ice.

52.      On or about February 10, 2004, defendant RING and Albaugh met with
representatives of the New Mexico tribe.

53.      On or about February 11, 2004, defendant RING emailed Albaugh to confirm their
meeting with one of defendant RING's clients.

### Honest Services Fraud Relating to the Office of Representative 5

54.      On or about January 26, 2000, defendant RING gave two suite tickets each to
Representative 5's Chief of Staff and District Director to a Washington Capitals ice hockey game at
the MCI Center, some of the many tickets for entertainment events that defendant RING gave
Representative 5's staff free of charge.

12

55.     On or about February 2, 2000, defendant RING sent an email to Abramoff in which he reported that Representative 5's Legislative Director had been calling the INS for a response to a letter sent to the INS by Representative 5 at defendant RING's and Abramoff's request, calling for an investigation into the immigration status of a woman who had been advocating minimum-wage and other labor reform that would adversely impact Abramoff's clients in the Commonwealth of the Northern Mariana Islands (CNMI).

56.     On or about February 9, 2000, defendant RING expensed lunch for Representative 5 at the Capital Grille, one of many meals at various restaurants that defendant RING bought for Representative 5 and expensed back to Firm B.

57.     On or about April 4, 2000, defendant RING expensed lunch for Representative 5 and Representative 5's Legislative Director at the Monocle.

58.     Later that day, on or about April 4, 2000, defendant RING sent an email to a congressional staffer in which he wrote that he had met Representative 5 and Representative 5's Legislative Director about CNMI appropriations projects and that Representative 5 had agreed to talk to the Chairman of the Committee on Transportation and Infrastructure about the projects.

59.     On or about April 5, 2000, defendant RING forwarded an email to Abramoff in which Representative 5's Legislative Director had confirmed that Representative 5 had asked another U.S. Representative to write a letter to the Army Corps of Engineers in support of several appropriations requests for CNMI.

60.     On or about April 24, 2000, defendant RING gave Representative 5's Legislative Director, at the Legislative Director's request, four club-level seats at Camden Yards for a June 11, 2000 Baltimore Orioles baseball game.

61.    On or about May 24, 2000, Abramoff sent an email to himself in which he reminded himself to call Representative 5's Chief of Staff about a job for Representative 5's wife.

62.    On or about May 25, 2000, defendant RING sent an email to Abramoff and another lobbyist in which defendant RING confirmed that Representative 5 would help on the Puerto Rico statehood issue, which was supported by an Abramoff client, and recommended that Representative 5 and his Chief of Staff visit Puerto Rico before introducing the bill because the visit "will give them a hook" for introduction of the bill.

63.    On or about June 23, 2000, defendant RING sent an email to Abramoff in which defendant RING reported that Representative 5 was ready to introduce the Puerto Rico statehood bill, that Representative 5 was prepared to answer questions about the bill, including questions about his motivation for introducing the bill, and that Representative 5 wanted a question-and-answer sheet on the issue.

64.    On or about June 26, 2000, defendant RING gave Representative 5's Chief of Staff eight suite seats at Camden Yards.

65.    On or about July 11, 2000, defendant RING, Abramoff, and Abramoff's Puerto Rico statehood client met with Representative 5 at his office.

66.    On or about July 13, 2000, defendant RING sent an email to Representative 5's Chief of Staff, Legislative Director, and another individual in which defendant RING asked the Legislative Director to make sure that Representative 5 remained opposed to an antigambling bill that adversely affected defendant RING's internet-gambling client.

67.    On or about July 13, 2000, defendant RING sent an email to Representative 5's Chief of Staff and Legislative Director to which defendant RING attached a draft "Dear Colleague"

14

letter regarding the internet-gambling client and in which defendant RING asked if he could get one more congressman to agree to sign the letter: "DO YOU THINK [Representative 5] COULD DO THIS LAST FAVOR (WE HOPE)?"

68.    On or about July 19, 2000, defendant RING received an email forwarded from Abramoff in which Abramoff had thanked Representative 5 for everything he had done and stated, "I will soon have something for you on the resources front."

69.    On or about August 16, 2000, defendant RING sent an email to Abramoff in which defendant RING reported that Representative 5's Chief of Staff had asked whether they had found employment for Representative 5's wife.

70.    On or about August 25, 2000, defendant RING gave Representative 5 four suite tickets to a Dixie Chicks concert at the MCI Center.

71.    On or about September 12, 2000, defendant RING sent an email to Abramoff in which he justified Representative 5's Legislative Director's request for tickets to a Washington Redskins game on October 30, 2000 by stating, "As he is an enormous help, I hope we can accommodate him."

72.    On or about September 14, 2000, Representative 5's Chief of Staff sent an email to defendant RING in which the Chief of Staff reported that Representative 5 said that he felt like a "subsidiary" of Firm A.

73.    On or about September 15, 2000, defendant RING gave Representative 5 four suite tickets to a Faith Hill concert at the MCI Center.

74.    On or about September 19, 2000, defendant RING sent an email to Abramoff in which he wrote that he planned to have lunch with Representative 5 and asked Abramoff if there

was "[a]nything in particular you want him to say besides that he will try to help our friend get funding for the project?"

75.    On or about September 20, 2000, defendant RING sent an email to Abramoff in which defendant RING wrote that Representative 5's Chief of Staff reported that Representative 5 was excited and appreciative of a possible employment opportunity for his wife and wanted to speak with Abramoff about the job.

76.    On or about September 26, 2000, Abramoff gave Representative 5 an entire suite for an event at Camden Yards.

77.    On or about October 3, 2000, defendant RING prepared Representative 5 for a hearing that Representative 5 was going to chair on the Puerto Rico statehood issue the following day.

78.    On or about October 4, 2000, shortly after the hearing on the Puerto Rico statehood issue, defendant RING sent an email to Abramoff in which he asked Abramoff to call Representative 5, noting that Representative 5 "was such a good soldier, doing everything we asked of him . . . . I know you are great about making sure he gets his fair share of contributions, but if [client] is feeling generous, this would be a very opportune time to get something to [Representative 5]."

79.    On or about October 10, 2000, Abramoff sent an email to Representative 5 in which Abramoff asked Representative 5 to let his wife know that Abramoff's associate, who was to provide her with a job, intended to contact her after the holidays.

80.    On or about October 30, 2000, defendant RING gave Representative 5's Legislative Director two suite tickets to a Washington Redskins football game at FedEx Field.

16

81.     On or about December 27, 2000, Representative 5 sent an email to Abramoff congratulating him on moving to Firm B and stating, "Thanks for all that you have done to help us and to help the cause this past year," to which Abramoff responded, "Please tell [your wife] I am sorry I have not been able to finish what we discussed, but I will have it in place soon."

82.     On or about January 22, 2001, defendant RING gave a Representative 5 staffer two tickets to a Washington Wizards basketball game at the MCI Center.

83.     On or about March 5, 2001, defendant RING gave a Representative 5 staffer three tickets to a World Wrestling Federation event at the MCI Center.

84.     On or about March 19, 2001, defendant RING expensed a lunch at the Willard Hotel for Albaugh, Representative 5's legislative director, and a third person.

85.     On or about March 27, 2001, defendant RING expensed a lunch at the Capital Grille for Representative 5 and members of Representative 5's staff.

86.     On or about April 25, 2001, defendant RING sent an email to Abramoff in which he discussed a trip to Puerto Rico for Representative 5's Chief of Staff and his wife and wrote, "I don't think they want to have too many scheduled visits or activities." Abramoff replied, "They don't need to have any scheduled activities."

87.     On or about June 20, 2001, defendant RING gave one of Representative 5's Legislative Assistants five tickets to a Baltimore Orioles baseball game at Camden Yards.

88.     On or about June 22, 2001, defendant RING expensed a lunch at the Capital Grille for Representative 5's Legislative Director and a Legislative Assistant.

89.     On or about July 19, 2001, defendant RING and another member of the lobbying team met with Representative 5's Legislative Director and another congressional staffer to discuss a

17

CNMI appropriations request and Representative 5's agreement to allow it into an energy and water bill.

90.     On or about July 21, 2001, defendant RING expensed a gift from Macy's to Representative 5's Legislative Director.

91.     On or about July 24, 2001, defendant RING sent an email to Abramoff and two other members of the lobbying team in which defendant RING reported that the CNMI appropriations request appeared doomed, but that Representative 5's Legislative Director "put in the request" and "got [Representative 5] to meet face-to-face with" another Representative to discuss the project.

92.     On or about July 27, 2001, defendant RING expensed a dinner at Oceanaire restaurant for Representative 5's Legislative Director and his wife.

93.     On or about August 30, 2001, defendant RING sent an email to Representative 5's Legislative Director in which defendant RING asked the Legislative Director to talk to a committee staffer to see if money for a CNMI project would be put into another appropriation request.

94.     On or about October 30, 2001, defendant RING gave Representative 5's Legislative Director two tickets to a Washington Capitals game at the MCI Center.

95.     On or about November 2, 2001, defendant RING sent an email to Representative 5's Chief of Staff in which defendant RING wrote that they needed help on a $16 million earmark for a jail for one of his tribal clients, that the House committee wanted to remove all of the earmarks, and that they needed Representative 5's help on this request.

96.     On or about November 2, 2001, defendant RING expensed a dinner at Oceanaire for DOJ officials and members of Representative 5's staff.

97.    On or about November 8, 2001, defendant RING sent an email to Representative 5 thanking Representative 5 for his help on the jail issue involving defendant RING's tribal client.

98.    On or about November 9, 2001, defendant RING forwarded to Abramoff an email from Representative 5—in which Representative 5 wrote that he had personally spoken to two congressional staffers who "were very sympathetic and wanted to help" on the jail issue—and defendant RING informed Abramoff that Representative 5 would urge another Representative "to take care of [a tribal client] in an end-of-year bill."

99.    On or about November 10, 2001, defendant RING expensed a dinner at Savoy 614 for members of Representative 5's staff.

100.    On or about December 2, 2001, defendant RING gave a Representative 5 Legislative Assistant two tickets to a Washington Redskins football game at FedEx Field.

101.    On or about December 5, 2001, Representative 5 sent an email to defendant RING in which Representative 5 reported that he had talked to another Representative's Deputy Chief of Staff and learned that the tribal-jail earmark would get done one way or the other, and that he would see if he could get an update.

102.    On or about December 10, 2001, Representative 5 sent an email to defendant RING in which he asked for help with an upcoming primary and in raising an additional $13,000 before December 31, 2001.

103.    On or about December 16, 2001, defendant RING gave Representative 5's Legislative Director three tickets to a Washington Redskins football game at FedEx Field.

104.    On or about January 1, 2002, defendant RING gave a Representative 5 Legislative Assistant two tickets to a Washington Capitals ice hockey game at the MCI Center.

105.    On or about January 20, 2002, defendant RING gave Representative 5's Legislative Director two tickets to an Elton John and Billy Joel concert at the MCI Center.

106.    On or about January 29, 2002, defendant RING sent an email to Abramoff in which he wrote that Representative 5 was "spooked" by his primary and asked if they could raise another $25,000 as soon as possible for a voter identification effort in Representative 5's district.

107.    On or about March 12, 2002, defendant RING expensed a dinner at Signatures for Representative 5's Chief of Staff.

108.    On or about March 19, 2002, defendant RING emailed Abramoff, writing that he had met with Representative 5, who had asked about the work that Abramoff was to get for Representative 5's wife.

109.    On or about April 12, 2002, defendant RING expensed a dinner at Signatures for Representative 5 and a tribal client.

110.    On or about April 20, 2002, defendant RING expensed over $2000 at Signatures for Representative 5's staff.

111.    On or about May 5, 2002, defendant RING gave two of Representative 5's staffers five tickets to a Baltimore Orioles baseball game at Camden Yards.

112.    On or about June 27, 2002, Volz sent an email to defendant RING in which Volz, after noting that they had secured a $3.5 million earmark for a client, stated that he assumed that they would "jack up" the client's fees after obtaining a couple of million dollars and reported that he was talking with Representative 5's Legislative Director to help Representative 5 "with the moderates."

113.   On or about August 12, 2002, defendant RING asked Abramoff for three tickets for Representative 5's Legislative Director and a Legislative Assistant for a Washington Redskins game at FedEx Field on September 16, 2002.

114.   On or about August 22, 2002, Abramoff met with Representative 5's wife regarding earlier discussions to provide her with a job and subsequently arranged payment of $1612.90 for the remainder of August 2002 and $5000 per month thereafter until February 2004.

115.   On or about September 10, 2002, Abramoff emailed a consultant to a nonprofit company that Abramoff controlled and wrote, "Mrs. [Representative 5]. She is [Representative 5]'s wife. She is on my payroll and will be available to work on [the nonprofit]. [C]an you call her to get her involved? Her home phone is the best place to reach her. I want her to help, but not be overburdened with work. [P]lease refer to me when you call her."

116.   On or about September 11, 2002, Abramoff emailed the nonprofit's consultant: "I am not sure what role she should play and it does not have to be significant. She should just be helpful to you as you need her. I don't want her to have to do too much, though, since she has responsibilities at home as a mother and wife."

117.   On or about September 16, 2002, defendant RING sent an email to Abramoff in which he reported that Representative 5's Legislative Director was complaining that he was in a suite at which alcohol was unavailable and was "in a really low box in the end zone. View is obviously not very good." Defendant RING asked whether that was "a mistake."

118.   On or about February 19, 2003, defendant RING sent an email to Representative 5's Legislative Director in which he stated, "[I] also think we should discuss a [municipal client's] post office soon. [T]hey didn't do what they said they would."

21

119.   On or about March 7, 2003, after Representative 5's Legislative Director had asked defendant RING for tickets to the first NFL game of the season and promised that he would never ask for anything again, defendant RING forwarded the email to Abramoff, stating, "So much for not asking for tix . . . . [Representative 5]'s LD is looking for 2 tix for the Skins-Jets game."

120.   On or about March 13, 2003, defendant RING sent an email to Representative 5's Legislative Director in which defendant RING submitted an earmark request for a client's "interchange project."

121.   On or about March 17, 2003—after an executive branch agency official had sent an email to Representative 5's office about a $1.8 million earmark inserted into the agency's budget, but which did not list the name, address, or any contact information concerning the earmark—defendant RING received the email from a Representative 5 staffer, who had forwarded it with the message, "I understand you are the representation on this request.  Can you fill in the below information please?"

122.   In or about March 2003, Abramoff canceled the charity event on which the wife of Representative 5 was working, but Abramoff continued to pay the wife of Representative 5 $5000 per month, purportedly for "marketing ideas" for Signatures.

123.   On or about April 21, 2003, defendant RING sent an email to Representative 5's Legislative Director to which defendant RING attached a $1 million appropriation request for a municipal client's cultural and business center, which was handled by Albaugh.

124.   On or about May 1, 2003, defendant RING sent to a congressional staffer an email in which he stated that Representative 5 would support the Congressional Gold Medal for one of Firm

22

B's clients and that Representative 5's Legislative Director would be the point of contact, "but you don't need to call him."

125. On or about June 4, 2003, defendant RING and a tribal client met with Representative 5 in his office and discussed their issues regarding a tribal-governance dispute that had caused the closure of the tribal casino on their reservation in Iowa.

126. On or about June 12, 2003, defendant RING sent an email to Representative 5's Legislative Director to which he attached a draft letter for Representative 5 to sign and send to the DOI that supported defendant RING's tribal client in the tribal-governance dispute and the reopening of the Iowa casino.

127. On or about June 12, 2003, defendant RING and Representative 5 caused a letter to be sent under his signature to the DOI in which he asked the Bureau of Indian Affairs to take a role in resolving the tribal-governance dispute, justifying the request in part on the fact that the dispute had led to the closure of the tribal casino.

128. On or about July 8, 2003, after Representative 5's Legislative Director had asked defendant RING if he could "score" "that box for ozzfest at merriweather post," defendant RING responded that he was checking on it and then asked if the Legislative Director had heard anything more on an appropriations request.

129. On or about July 14, 2003, Representative 5's Legislative Director thanked defendant RING for tickets to a Bruce Springsteen concert for two staffers for two other Representatives, one of whom eventually emailed defendant RING and stated, "Please don't hesitate to contact me if the [Representative's] office can ever be of assistance. Also, my

girlfriend . . . is a counsel to [another Representative].  I'm sure she would be happy to be of

assistance[]in the future as well."

130.    On or about July 21, 2003, defendant RING expensed catering for an event for

Representative 5.

131.    On or about July 22, 2003, defendant RING sent an email to Representative 5 in

which he stated that Representative 5's Legislative Director had been an incredible asset to the

office, noting that the Legislative Director had been "tenacious on the appropriations front to the

benefit of the [municipal client]," and concluding, "It was good to see you today and I hope we can

get together soon."

132.    On or about October 2, 2003, defendant RING arranged a meeting between himself,

a Massachusetts tribal client, and Representative 5 in Representative 5's congressional office.

133.    On or about October 7, 2003, defendant RING sent an email to Representative 5's

Legislative Director in which he stated, "Assuming [Representative 5] never called [a high level

DOI official] after our meeting last week, I thought the attached letter would be okay to send to [the

Secretary of the DOI].  Pretty non-controversial—says he doesn't take position on their petition for

recognition, but thinks they deserve an answer.  Assuming this is fine, please fax signed copy to me

at [deleted].  Thanks.  You the man."

134.    On or about October 7, 2003, Representative 5 caused a letter to be sent under his

signature to the Secretary of the DOI in which he asked that the DOI respond to the Massachusetts

tribal client's request for recognition expeditiously.

135.    On or about February 10, 2004, Representative 5's Communications Director, who

had been helping defendant RING with tax legislation benefiting one of his clients, emailed

24

defendant RING, "Haha!  [J]ust earning my Sigs Sushi ;)," to which defendant RING replied, "Exactly.  I will keep you occupied," to which the staffer responded, "Keep it coming—this is the fun stuff."

136.    On or about February 23, 2004, Representative 5's wife deposited her last paycheck from Firm B, the final $5000 payment of approximately $96,000 that Firm B paid her.

## Honest Services Fraud Relating to Ney's Office

137.    On or about March 14, 2001, defendant RING and another Firm B lobbyist attended a meeting with Ney in Ney's office to secure his agreement to cosponsor legislation that would allow Abramoff's clients, who were garment manufacturers, to use "Made in the USA" labels on garments manufactured in the CNMI, while exempting the manufacturers from federal labor laws applicable to manufacturers operating in the continental United States.

138.    On or about April 18, 2001, defendant RING sent an email to Abramoff and another member of the lobbying team in which defendant RING endorsed providing the "Camden Box" to the office of another Representative who intended to cosponsor with Ney the "Made in the USA" bill, stating, "I think he should be groomed to help us down the road."

139.    On or about July 11, 2002, defendant RING and others received an email from a congressional staffer advising them of an amendment to a DOI appropriation bill that proposed the creation of a commission to study Indian gaming and predicted that "the tribes are going to be extremely upset" about the amendment if not stricken, which defendant RING then forwarded to Abramoff and other members of the lobbying team, noting his agreement with the staffer's assessment and the need to take action.

25

140.    On or about July 15, 2002, defendant RING received a second email from the congressional staffer in which the staffer stated that the commission proposed by the amendment would kill Indian gaming, because the commission "would be stacked with anti-Indian gaming members" and attached a draft letter that opposed the amendment as a violation of a House rule, which defendant RING then forwarded to Heaton, stating in the body of the email that he (defendant RING) "was asked to share this with you. Thanks for your help."

141.    On or about July 15, 2002, defendant RING thanked Heaton for an email in which Heaton informed him that Ney had agreed to sign the letter opposing the commission and "[w]anted to know if anything stronger would be coming out later and he is glad to help."

142.    On or about July 16, 2002, Volz expensed about $2200 worth of food and drinks at Signatures for Ney, his staff, and others during a birthday party for Heaton.

### Other Honest Services Fraud Relating to Work Done for the New Mexico Tribe

143.    On or about March 21, 2002, defendant RING emailed Abramoff, "We need to talk about what you can do to help on [the New Mexico tribe] to freeze the linebackers—like calling [a senior DOI official] or others and letting them know we are on the case. The position is easy: they should support the settlement, which is binding on them (at least until it expires)."

144.    On or about March 27, 2002, defendant RING emailed other Firm B employees that he had given two tickets to opening-day at Camden Yards to a certain executive-branch official involved in intergovernmental affairs.

145.    On or about April 4, 2002, defendant RING emailed other lobbyists at Firm B informing them that the executive-branch office on intergovernmental affairs had called the DOI in support of a settlement agreement benefiting the New Mexico tribe.

146.    On or about July 17, 2002, defendant RING emailed the New Mexico tribe's governor and others to inform them that the executive branch official had called a U.S. Senator to support the settlement agreement.

147.    On or about January 30, 2003, a lobbyist at Firm B emailed a staffer for the New Mexico tribe's U.S. Representative, "Sorry I couldn't hangout last night.  I greatly appreciate your taking the time to han[g]out with the [New Mexico tribe].  It meant a lot to [K]evin and I [sic]. BTW, you should be all set for the [Los Angeles] Clippers [basketball] game."

148.    On or about February 10, 2003, defendant RING emailed Abramoff to ask whether they could give the executive-branch official four "floor tickets (3rd row is fine)" for a Washington Wizards game, because the executive-branch official "keeps asking me and I want to help her."

149.    On or about February 20, 2003, defendant RING sent an email to the executive-branch official asking whether she was "[a]ll set to use the fruit [i.e., tickets] on new date?," to which the executive-branch official replied, "I need to talk to you ASAP about [the New Mexico tribe.]"

150.    On or about February 20, 2003, defendant RING emailed the New Mexico tribe's governor and lawyer to inform them that the executive-branch official had "put [the New Mexico tribe] on the list of people [the federal government] can work with."

151.    On or about March 4, 2003, a lobbyist at Firm B emailed defendant RING, "I'm going to kill [the New Mexico tribe] with [its U.S. Representative] if we don't get hired."

152.    On or about November 10, 2003, defendant RING emailed the Senate appropriations staffer, "I didn't know you put the [New Mexico tribe] settlement money in the Senate bill.  You are

27

a stud—not that that's news to you." In the same email chain, defendant RING wrote, "Next time I will read the Senate bill to see what other surprises you have in their [sic] for my clients."

### Honest Services Fraud Relating to the DOJ

153.    On or about April 16, 2001, defendant RING sent an email to Coughlin in which defendant RING asked Coughlin for assistance on a federal grant matter for one of his tribal clients, which sought a $16.3 million federal grant from the DOJ to build a jail.

154.    On or about April 19, 2001, defendant RING asked Coughlin to attend a tribal jail grant meeting with other DOJ officials, "[e]ven if it is just at the beginning to say hello, [because] it would be good if you were there so some of the clowns there know that I have friends, if you get my drift." Coughlin agreed to attend the meeting.

155.    On or about April 19, 2001, after the DOJ meeting regarding the tribal jail grant issue, defendant RING expensed a dinner at Olive's for Coughlin, one of many meals at various restaurants that defendant RING bought for Coughlin and expensed back to Firm B.

156.    On or about April 24, 2001, during an email in which Coughlin thanked defendant RING for the dinner, defendant RING asked for more information about the tribal-jail grant from Coughlin, who in turn told defendant RING that the DOJ had approved the tribe's receipt of only $9 million and volunteered to help "come [up] with some strategy in order to make sure they [i.e., defendant RING's tribal client] get the rest of the money."

157.    On or about May 1, 2001, defendant RING again invited Coughlin to dinner after Coughlin emailed defendant RING with the name of "our friendly in OJP" (i.e., the Office of Justice Programs) and offered to call the "friendly" and set up a meeting regarding the jail grant.

158.   On or about October 15, 2001, defendant RING sent an email to Abramoff in which defendant RING asked Abramoff to approve a ticket for Coughlin to an upcoming Washington Redskins football game and justified his request by stating, "[Two others and] Bob Coughlin (DOJ)—all have been and are being helpful."

159.   On or about October 17, 2001, defendant RING sent an email to Coughlin in which defendant RING asked Coughlin for assistance in interpreting certain language in the USA PATRIOT Act on behalf of a client, and stated, "If there are others in your office that might want to go to the Skins game Sunday, let me know."  This was one of many occasions that defendant RING offered tickets to sporting events and concerts to Coughlin and other DOJ officials.

160.   On or about November 12, 2001, defendant RING sent an email to Coughlin and another DOJ official in which defendant RING stated that Firm B had "reached a crisis point" in its effort to obtain the $16.3 million federal grant and explained that "[m]y senior partner, Jack Abramoff, has made abundantly clear to me that this is the highest priority. . . . PLEASE let me know how to make this happen.  THANKS to you both in advance."

161.   On or about December 5, 2001, Coughlin emailed defendant RING that he would forward a letter defendant RING had sent from the Senate minority and majority leaders, regarding the jail, along to higher ranking DOJ officials and thanked him "for everything" the other night. Defendant RING replied that he believed that the next letter concerning the tribal-jail grant would be signed by three senior members of the House Republican leadership, asked Coughlin to keep that information in confidence, and asked, "As for the other night . . . [p]lease tell me the waiter didn't charge you guys for dinner."

29

162.    On or about December 27, 2001, defendant RING sent an email regarding the tribal-jail grant to Coughlin in which defendant RING stated, "Please see the attached [House leadership letter] and feel free to distribute within the Department," causing Coughlin on or about the next day to agree to distribute the letter to "the appropriate people within the Department" and then ask if he and his cousin "could watch the [Wizards] game in the suite?"

163.    On or about December 28, 2001, defendant RING agreed to give Coughlin four suite tickets to the Wizards game at the MCI Center on January 26, 2002, some of the many tickets for entertainment events that defendant RING gave to Coughlin free of charge.

164.    On or about January 8, 2002, defendant RING sent an email to the other lobbyists indicating that he had received a call from the DOJ's Office of Legislative Affairs regarding the reaction to the House leadership letter of the DOJ official overseeing the tribal-grant issue.

165.    On or about January 17, 2002, defendant RING sent an email to Coughlin in which defendant RING sought Coughlin's assistance in determining whom defendant RING should contact about a land dispute between two tribes, causing Coughlin to respond, "I will look into it and get back to [you] asap."

166.    About an hour later, on or about January 17, 2002, defendant RING asked if Coughlin wanted to go to an upcoming Elton John and Billy Joel concert and Coughlin responded, "I would love to." Defendant RING asked how many tickets Coughlin wanted and Coughlin replied, "I contacted our Indian Affairs office . . . . I am trying to track down who the right person is to talk to in ENRD [Environment and Natural Resources Division] because I don't know if we have any 'friends' in that component."

167.   On or about January 22, 2002, defendant RING sent an email regarding the tribal-jail grant to Abramoff in which defendant RING advised Abramoff that he had heard "COMPLETELY confidential" news from his source at DOJ's Office of Legislative Affairs that the DOJ official overseeing the tribal grant issue had "kicked the final decision on the jail upstairs" to more senior DOJ officials.

168.   On or about January 26, 2002, while out with Coughlin before a Washington Wizards basketball game, defendant RING sent an email to Abramoff and another lobbyist stating that Coughlin just told him that a senior DOJ official "will get the joke. We'll see Monday," referring to a scheduled telephone conference between defendant RING and the official, regarding the jail grant. The other lobbyist responded, "I love it when they get the joke."

169.   On or about January 28, 2002, defendant RING had a teleconference with the senior DOJ official.

170.   On or about January 30 or 31, 2002, the DOJ reversed its prior decision and decided to award a $16.3 million federal grant to defendant RING's tribal client for construction of the jail. Thereafter, defendant RING continued to lobby the DOJ seeking a waiver of the DOJ's requirement that the contract to construct the tribal jail be competitively bid.

171.   On or about February 4, 2002, defendant RING sent an email to Abramoff in which defendant RING informed Abramoff that Coughlin wanted two tickets for the upcoming Dave Matthews Band concert and justified his request by stating, "Bob really helped on the [tribal client] jail."

172.   On or about February 4, 2002, defendant RING sent an email to another member of the lobbying team in which defendant RING informed the lobbyist that he had the MCI Center suite

31

for the Dave Matthews Band concert "filling up with DOJ staffers that just got our client $16 million," causing the lobbyist to respond, "[A]s for DOJ staffers, those guys should get anything they want for the rest of the time they are in office—opening day tickets, Skins v Giants, oriental massages, hookers, whatever."

173.   On or about February 8, 2002, another lobbyist on the Abramoff team sent an email to a Senate staff member in which he explained that "the demand [for tickets to the Dave Matthews Band concert] is simply too high from people who do 'dirt' for us on a regular basis."

174.   On or about March 12, 2002, Abramoff emailed defendant RING and other lobbyists regarding what considerations should govern a request from a Member of Congress for use of an MCI Center suite during the NCAA basketball tournament: "[T]he question for any request like this . . . is whether there is a Member out there who has done more for us or whether this ask (which is a huge prize) will make sure that this Member does do stuff for us in the future.  We need to get the most from this request."

175.   On or about March 14, 2002, defendant RING asked for approval to give NCAA men's basketball tournament tickets to the senior DOJ official whom defendant RING had lobbied regarding the tribal jail.  Abramoff approved the request.

176.   On or about March 16, 2002, defendant RING sent an email to another member of the lobbying team, who had been present at an NCAA men's basketball tournament game with the senior DOJ official, indicating that defendant RING needed the official's further assistance regarding the lobbying efforts on the $16.3 million grant.  Defendant RING wrote, "Glad he got a chance to relax.  Now he can pay us back."

177.    On or about April 5, 2002, defendant RING asked Coughlin to attend an April 11 dinner with defendant RING, another lobbyist, and a client in order "to fill this guy's schedule with meetings." Coughlin agreed and defendant RING and the other lobbyist gave the client an itinerary for the dinner which read, in part, "Dinner with Bob Coughlin, Professional Staff, Department of Justice Inter-government Affairs Office."

178.    On or about April 11, 2002, defendant RING and another Firm B lobbyist expensed a meal at Signatures to Coughlin.

179.    On or about April 23, 2002, Coughlin told defendant RING that he would be attending a Senate committee hearing relating to a land claim on behalf of the New Mexico tribe and agreed to provide RING with a copy of a DOJ Assistant Attorney General's testimony as soon as it was cleared.

180.    On or about May 1, 2002, Coughlin transferred from the Office of Legislative Affairs to the Office of Intergovernmental and Public Liaison, where Coughlin continued to contact DOJ officials in order to answer numerous inquiries from defendant RING about the tribal-jail grant and to advise defendant RING about whom he should contact.

181.    On or about June 25, 2002, after defendant RING and other members of the lobbying team learned that their request to waive the competitive-bidding requirement for the $16.3 million federal grant had been approved, defendant RING wrote an email to the other lobbyists in which he stated, "Don't thank me—thank your friends on the Hill and in the Administration. In fact, thank them over and over this week—preferably for long periods of time and at expensive establishments. . . . Thank them until it hurts—and until we have a June bill that reflects the fact that our client is about to get a $16.3 million check from the Department of Justice!!!!!"

182.   On or about June 25, 2002, defendant RING sent an email captioned "FW: [Tribe]: CHA-CHING!!!!" to Coughlin in which defendant RING stated, "Thanks is not strong enough. We need to celebrate this issue finally being over."

183.   On or about June 28, 2002, defendant RING expensed a lunch at Signatures for Coughlin and two other DOJ officials.

184.   On or about February 7, 2003, defendant RING sent an email to Coughlin regarding the need for assistance relating to Eshkol Academy, a school owned by Abramoff, in which defendant RING stated, "Eshkol Academy needs an expedited review and approval of the I-17 (application[] to admit F non-immigrant students) including expedited site visit. In the alternative, they can request to issue interim approval while application is pending. . . . A site visit must be conducted ASAP."

185.   On or about February 7, 2003, Coughlin forwarded defendant RING's email request to two DOJ employees, including an employee of the INS, to whom Coughlin wrote, "Thank you for looking into this. I do not know if anything can be done but I said I would look into it. If, for any reason, nothing can be done, please email me so I can pass that along. Thank you very much for you[r] assistance."

186.   On or about February 10, 2003, after Coughlin notified defendant RING that INS had agreed to expedite the review of Eshkol Academy, defendant RING notified Abramoff of the success, prompting Abramoff to reply, "Kevin, you are the greatest. Unfortunately the way my nutty life is structured, these things mean everything in the world to me and often more than so many other things. Thanks my friend." Defendant RING thereupon sent an email to Coughlin in which defendant RING stated, "I cannot thank you enough for helping on this. Jack [Abramoff]

was very appreciative. You really helped me out. Drinks Thursday night?" Coughlin accepted that invitation.

187.    On or about February 11, 2003, in reply to defendant RING's invitation to drinks, Coughlin requested from defendant RING four Wizards tickets on both March 15th and March 18th, which Defendant RING relayed to Abramoff and justified the ticket request by stating, "Bob Coughlin (DOJ). . . . Helped on the school and is now looking for tickets to the Wizards on both March 15 and 18." Abramoff replied, "Totally!!!! Give him CC's [third-row seats] for both games please. Thanks again Kevin."

All in violation of 18 U.S.C. § 371.

## COUNT II
### (Payment of Gratuities)

1.    Paragraphs 1 through 18, 20 through 28, and 153 through 187 of Count I are realleged and incorporated here.

2.    Between on or about February 7, 2003 and on or about March 18, 2003, in the District of Columbia, the defendant,

### KEVIN A. RING,

otherwise than as provided by law for the proper discharge of official duty, directly and indirectly gave, offered and promised anything of value (to wit, eight tickets total to two Washington Wizards basketball games) to a public official (to wit, Robert Coughlin, an official of the United States Department of Justice), for and because of an official act performed and to be performed by such public official (to wit, contacting an employee of the Immigration and Naturalization Service and

35

requesting an expedited review and approval of the application to admit nonimmigrant students,

relating to Eshkol Academy).

All in violation of 18 U.S.C. §§ 201(c)(1)(A) and 2.

## COUNTS III-VIII
(Honest Services Wire Fraud)

1.    Paragraphs 1 through 18 of Count I are realleged and incorporated here.

2.    From at least as early as January 2000 through at least October 2004, in the District

of Columbia and elsewhere, defendant RING devised and intended to devise a scheme and artifice

to defraud and deprive the United States and its citizens of their right to the honest services of

certain public officials within the legislative and executive branches, performed free from deceit,

fraud, concealment, bias, self-enrichment, and self-dealing, as set forth in paragraphs 20 through

187 of Count I, which are realleged and incorporated here.

### The Use of Interstate Wires in Execution of the Scheme

3.    On or about the date of each Count listed below, in the District of Columbia and

elsewhere, the defendant

## KEVIN A. RING,

for the purpose of executing the above-described scheme and artifice to defraud and attempting to

do so, did knowingly transmit and cause to be transmitted in interstate commerce, by means of a

wire communication, certain signs, signals and sounds listed below:

| COUNT | APPROXIMATE DATE OF WIRE | MATTER/THINGS WIRED |
|-------|--------------------------|---------------------|
| III   | February 11, 2003        | An email from ringk@gtlaw.com to Robert.Coughlin@usdoj.gov with the subject line, "RE:RE:FW:FW: Eshkol SEVIS issue" |

36

| IV | November 17, 2003 | An email from ringk@gtlaw.com to john.albaugh@mail.house.gov with the subject line, "Things" |
|---|---|---|
| V | November 20, 2003 | An email from ringk@gtlaw.com to john.albaugh@mail.house.gov with the subject line, "RE: Nov 30 skins" |
| VI | November 24, 2003 | An email from ringk@gtlaw.com to john.albaugh@mail.house.gov with the subject line, "FW: Sunday's Redskins game against the Saints" |
| VII | January 13, 2004 | An email from the address john.albaugh@mail.house.gov to the address ringk@gtlaw.com with the subject line, "RE: hope you had a nice break" |
| VIII | February 23, 2004 | A check for $5000 drawn from a Wachovia Bank, National Association account of Firm B and deposited into a Wright Patman Congressional Federal Credit Union account controlled by Representative 5's wife |

All in violation of 18 U.S.C. §§ 1343, 1346, and 2.