# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| v. ) | **Criminal No. 08-274 (ESH)** |
| ) | |
| **KEVIN A. RING,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM OPINION

### BACKGROUND

On September 5, 2008, a federal grand jury indicted Kevin Ring, a lobbyist who worked with Jack Abramoff, for payment of an illegal gratuity (Count II), honest services wire fraud (Counts III, IV, V, VI, VII, and VIII), and conspiracy (Count I). A jury trial that commenced on September 1, 2009 ultimately resulted in a hung jury on all counts.[1] A second trial commenced on October 18, 2010. Following a two-week trial and four days of deliberations, the jury returned a verdict of guilty on Counts I, II, III, VII, and VIII and a verdict of not guilty on Counts IV, V, and VI.

Before the Court is the matter of calculating the appropriate sentence for defendant under the Sentencing Guidelines. The parties' respective positions could hardly differ more dramatically. By the government's calculation, Ring's total offense level is 37, corresponding to

---

[1] Because seven of the eight counts involved violations of the honest services wire fraud statute, 18 U.S.C. § 1346, the Court continued the retrial pending the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010), which was handed down on June 24, 2010.

a Guidelines sentence of 210 to 262 months.[2]  Defendant, however, calculates his offense level

as 16,[3] resulting in a Guidelines range of 21-27 months—a difference of approximately 17 years.

Before the Court can proceed to sentencing, it must resolve this stark conflict between the

parties, for in the wake of *Booker v. United States*, 543 U.S. 220 (2005) and *Gall v. United*

*States*, 552 U.S. 38 (2007), a set of procedural requirements have developed that govern

sentencing.  "A district court begins by calculating the appropriate Guidelines range, which it

treats as 'the starting point and the initial benchmark' for sentencing." *United States v. Akhigbe*,

642 F.3d 1078, 1084 (D.C. Cir. 2011) (quoting *Gall*, 552 U.S. at 49).  "Then, after giving both

parties an opportunity to argue for whatever sentence they deem appropriate," the court considers

all of the sentencing factors listed in 18 U.S.C. § 3553(a)[4] and undertakes "an individualized

assessment based on the facts presented."  *Id.* (citing *Gall*, 552 U.S. at 49-50).

_____

[2] Everyone agrees that defendant's criminal history category is I.

[3] Although Ring has advocated against the use of the 8-level "public official" enhancement, he
appears to ultimately concede that this objection is secondary to his "core position" in favor of
consistency between similarly-situated co-conspirators.  (Dkt. No. 272 at 14.)

[4] Section 3553(a) states in pertinent part:

> The court shall impose a sentence sufficient, but not greater than necessary, to
> comply with the purposes set forth in paragraph (2) of this subsection. The court,
> in determining the particular sentence to be imposed, shall consider--
>
> > (1) the nature and circumstances of the offense and the history and
> > characteristics of the defendant;
> > (2) the need for  the sentence imposed--
> > > (A) to reflect the seriousness of the offense, to promote respect
> > > for the law, and to provide just punishment for the offense;
> > > (B) to afford adequate deterrence to criminal conduct;
> > > (C) to protect the public from further crimes of the defendant;
> > > and
> > > (D) to provide the defendant with needed educational or
> > > vocational training, medical care, or other correctional treatment
> > > in the most effective manner;
> > (3) the kinds of sentences available;

Given the complexity of the sentencing issues that confront the Court, it ordered the parties to brief the disputed factual and legal issues that must first be resolved, reserving briefing and argument as to the § 3553(a) factors until after a Guidelines range had been determined. Oral argument was held on August 30, 2011.

Ring asserts that he is being penalized for exercising his Sixth Amendment right to trial, arguing that the government should be bound by the prior methodology it has consistently used for calculating the Guidelines sentences of the other Greenberg Traurig lobbyists/ co-conspirators who were also convicted of honest services fraud.  The Court will address this issue first, and then will turn to the host of remaining disputes regarding the calculation of defendant's Guidelines sentence, which include:

1. Whether to apply U.S.S.G. §2C1.7 (honest services fraud) or §2C1.1 (bribery) as the applicable offense of conviction.

2. Whether to apply the 2-level enhancement for offenses involving "more than one bribe." U.S.S.G. §2C1.1(b)(1).

3. Calculation of the "benefit received or to be received." U.S.S.G. §2C1.1(b)(2)(A).

4. Calculation of the "value of the payment" or "value of anything obtained or to be obtained by a public official or others acting with a public official." U.S.S.G. §§2C1.1(b)(2)(A) or 2C1.7(b)(1)(A).

---

(4) the kinds of sentence and the sentencing range established for--
   (A) the applicable category of offense committed by the
   applicable category of defendant as set forth in the guidelines--
   . . .
(5) any pertinent policy statement--
   . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

3

5. Whether to apply the eight-level enhancement for offenses involving "an elected official or any official holding a high-level decision-making or sensitive position." U.S.S.G. §§2C1.1(b)(2)(B) and 2C1.7(b)(1)(B).

6. Whether to apply the 3-level "manager or supervisor" enhancement. U.S.S.G. §3B1.1.

7. Whether to apply the 2-level enhancement for obstruction of justice. U.S.S.G. §3C1.1.

8. Whether defendant is entitled to a 2-level reduction for acceptance of responsibility. U.S.S.G. §3E1.1.

## ANALYSIS

## I. VIOLATION OF THE SIXTH AMENDMENT RIGHT TO TRIAL

This prosecution arose out of the Jack Abramoff lobbying scandal that first came to light in early 2004. Between 2005 and 2009, Abramoff, along with his fellow lobbyists from Greenberg Traurig—Michael Scanlon, Neil Volz, Todd Boulanger, and Tony Rudy—pled guilty to participating in an influence-peddling and bribery scheme whereby they provided travel, meals, tickets to sporting events, and other things of value to federal public officials, with the expectation that these officials would, in turn, perform official acts on behalf of the lobbyists' clients on an "as-needed" basis. Some of the public officials, including Ann Copland (staffer to Sen. Thad Cochran), John Albaugh (chief of staff to Rep. Ernest Istook), Mark Zachares (aide to Rep. Don Young), former Congressman Robert Ney, and William Heaton (Ney's chief of staff), also pled guilty to honest services fraud for their role in the scheme.

The Guidelines calculations for each of these defendants are detailed in Appendix A. Each of the public official defendants pled guilty to honest services fraud, and for each, the government entered into a plea agreement stipulating to an applicable base offense level under

the 2003 Guidelines[5] of 10 (under §2C1.7) plus 8 levels for an offense involving an "elected or high-level decision-making official" (per §2C1.7(b)(1)(B)) for a total offense level of 18, prior to adjusting for role in the offense or acceptance of responsibility. In addition, Heaton and Zachares received 5K1.1 letters in recognition of their cooperation with government investigators. The government's sentencing recommendations for this group of defendants ranged from six months of home confinement (for William Heaton) to 27 months incarceration for Bob Ney, who was the only elected official charged in this conspiracy and the only one of the many co-conspirators who pled but did not cooperate with the government.[6]

Each of the Greenberg Traurig lobbyist defendants (except for Scanlon and Abramoff) entered into similar plea agreements with the government, whereby Guideline §2C1.7 and an 8-level "elected official" enhancement was used, resulting in a total offense level of 18 prior to adjustments, including a 3-point reduction for acceptance of responsibility. Of these, only Volz has been sentenced as of this date—the government recommended a sentence "at the low end" of 4-10 months of home confinement. Without taking into account the 5K1.1 letter they are expected to receive for their cooperation, Rudy and Boulanger have agreed to Guidelines

---

[5] The D.C. Circuit has held that under the principles articulated in *Miller v. Florida*, 482 U.S. 423 (1987), application of post-offense versions of the Guidelines violates the Ex Post Facto Clause if the subsequent revisions increase a defendant's sentencing range. *United States v. Turner*, 548 F.3d 1094, 1099-1100 (D.C. Cir. 2008). Because defendant's sentencing range under the Guidelines would be higher under the current version of the Guidelines Manual, the Court agrees with the parties that the 2003 version must apply. Accordingly, all references to the Sentencing Guidelines are to the 2003 Manual, unless otherwise noted.

[6] In addition to those defendants who appear in Appendix A, others involved in the Abramoff scandal who pled guilty include Robert Coughlin (illegal gratuities), James Griles (obstruction of justice), Italia Federici (obstruction of justice and tax evasion), and Horace Cooper (misdemeanor making and using a false certificate or writing). In addition, Fraser Verrusio was found guilty by a jury for illegal gratuities and false statements, and David Safavian was found guilty by a jury for false statements and obstruction of justice.

calculations that expose them to 24-30 months incarceration and 18-24 months incarceration, respectively.

Scanlon and Abramoff faced higher sentencing ranges under the Guidelines, having been convicted of multiple counts including a kickback conspiracy to defraud Abramoff's clients known as "Gimme Five." Scanlon's Guidelines range (including a 3-level reduction for acceptance of responsibility) was 51-63 months, while Abramoff faced a range of 108-135 months. The government recommended a sentence of 24 months for Scanlon and an effective sentence of 39 months for Abramoff,[7] having given both 5K1.1 letters for their cooperation.

As Ring points out, the government now advocates for a Guidelines methodology that it has never asked for before (and that the Court has not previously employed) with respect to calculating the sentences of his co-conspirators. The government urges the Court to apply the cross reference found at §2C1.7(c)(4) and sentence defendant under the bribery guideline, §2C1.1—something it has done only for Abramoff and Scanlon (who, unlike Ring, were actually charged with conspiracy to commit bribery in violation of 18 U.S.C. § 201(b)). (*See* Dkt. No. 257 at 2.) For each of the other co-conspirators charged with honest services fraud, the government advocated for a Guidelines calculation pursuant to §2C1.7.

In addition, the government is not seeking to apply the 8-level elected-official enhancement that it applied to the other co-conspirators, including Scanlon and Abramoff.[8] Instead, it advocates for a 20-level enhancement based on the benefits received by the lobbyists'

---

[7] While the government technically requested that the Court impose a sentence of 64 months for Abramoff, it requested that this sentence run concurrently with the sentence previously imposed by the Southern District of Florida in a manner that gave him credit for time already served on that sentence. *See* Sentencing Hearing at Tr. 30:13-31:6, *United States v. Abramoff*, No. 06-cr-001 (D.D.C. Sept. 4, 2008).

[8] The one exception is Ann Copland, for whom the elected or high-level decision-making official enhancement did not apply.

clients in exchange for the bribes provided to public officials, or in the alternative, a 16-level enhancement based on the value of the bribes paid to the public officials. (*See id.* at 6-19.)

Defendant's position is that the government is retaliating against him for exercising his Sixth Amendment right to trial. It is easy to see why such an inference might be justified, since the government's new methodology for calculating defendant's offense level (prior to adjustments for role in the offense and obstruction of justice) would result in a Guidelines sentence of between 121 and 151 months—nearly nine years longer than it would otherwise have been. Even assuming that the §2C1.1 cross reference applies, the use of the 20-level "value of benefits received" enhancement in lieu of the 8-level "elected official" enhancement translates into an eight-year difference in the ultimate sentence. Indeed, the government's position is that Ring's total offense level (37) should be the highest of all participants in the conspiracy, despite the fact that Abramoff (whose offense level was 34, not including acceptance of responsibility) and Scanlon (whose offense level was 27, not including acceptance of responsibility) were clearly more culpable.

The notion that an ostensibly objective system of sentencing guidelines can produce such wildly varying results for essentially the same offense conduct is deeply troubling, and indeed, as Ring argues, if the Guidelines are "subject to manipulation" in this fashion, it would mock the very consistency the Guidelines were meant to impose on such elementary concepts as "offense level." (Dkt. No. 258 at 5.)

The government's first line of response is to argue that Ring is *not* similarly situated to his co-conspirators, because "he is the only lobbyist who went to trial and chose not to plead

guilty and cooperate with the United States."[9]  (Tr. 8/30/11 5:21-22.)  Taken at face value, this

position could have a noticeable chilling effect on the exercise of one's right to a jury trial.

While disparities in the ultimate sentence that result from cooperation "are not unreasonable,"

and it is "constitutionally prop[er]" for the government to "[f]ail[] to afford leniency to those

who have not demonstrated those attributes on which leniency is based,"  *United States v.*

*Carter*, 560 F.3d 1107, 1121 (9th Cir. 2009), the government cannot retaliate against defendant

for exercising his rights. *United States v. Mazzaferro*, 865 F.2d 450, 460 (1st Cir. 1989).  The

Guidelines contain numerous provisions that account for leniency to be afforded to those who

plead guilty or cooperate with the government.  Prosecutors may bring fewer or different

charges.[10]  "Absent malfeasance, the Judiciary has nothing to say about charge bargaining and,

quite appropriately, it says nothing."[11]  *Berthoff v. United States*, 140 F. Supp. 2d 50, 61-62 (D.

---

[9] The government made this point repeatedly at oral argument.  (*See, e.g.*, Tr. 8/30/11 9:20-10:2 ("And while there's an argument to be made that they are similarly situated because they engaged in similar factual conduct, . . . they are not similarly situated in that they chose to proceed to trial.  Mr. Ring chose to proceed to trial, expend government resources, the court's resources and the public's resources and therefore is not similarly situated to others who pled guilty early on in the investigation.").)

[10] As the government has noted, Ring differs from his co-conspirators in that he was convicted of both honest services fraud and illegal gratuities (as well as conspiracy to commit both crimes). (*See* Dkt. No. 274 at 7.)  This fact has no impact on the Guidelines calculations for defendant, however, because the Court agrees with the parties that the honest services counts (Counts III, VII, VIII and the honest services fraud overt act of Count I) are properly grouped together with the illegal gratuities counts (Count II and the illegal gratuities overt act of Count I) pursuant to §3D1.2(d).  Accordingly, the offense level for these counts is determined by "the offense guidelines that produces the highest offense level," which is §2C1.1.  §3D1.3(b).

[11] For example, the government permitted Robert Coughlin to plead to violating 18 U.S.C. § 208, conflict of interest involving a personal financial interest, as opposed to honest services fraud, even though the Wizards tickets received by Coughlin were charged in the Ring indictment both as an illegal gratuity (Count II) and as honest services fraud (Count III).  As the conflict of interest involved a gratuity, Coughlin was sentenced pursuant to §2C1.2 (illegal gratuity), which has a lower base level (7) than either §2C1.1 or §2C1.7 (both of which have a base level of 10).

Mass. 2001), *aff'd on other grounds*, 308 F.3d 124 (1st Cir. 2002).[12]  At sentencing, §3E1.1

provides for up to a 3-level reduction for defendants who clearly demonstrate acceptance of

responsibility or who timely notify the government of their intention to plead guilty. The

government can agree to cooperation agreements with defendants, and defendants who provide

information concerning the unlawful activities of others under such agreements may be protected

from having the "full" extent of their offense conduct used against them.  §1B1.8(a).  Most

significantly, cooperating witnesses who provide "substantial assistance" to the government may

be rewarded with leniency in the form of a §5K1.1 letter permitting the court to downwardly

depart from the Guidelines.[13]

The leniency that results from such cooperation can be dramatic.  Jack Abramoff's

offense level prior to accounting for acceptance of responsibility under §3E1.1 was 34,

corresponding to a Guidelines range of 151-188 months.[14]  Combining the §5K1.1 letter with the

3-level reduction for acceptance of responsibility, the government's leniency took the form of a

recommended sentence at least 112 months shorter than it would have been had Abramoff gone

to trial and been found guilty, a 75 percent reduction.  Neil Volz faced an offense level of 18—a

Guidelines range of 27 to 33 months.  The government recommended a sentence "at the low

end" of the sentencing range for an offense level of 9 or approximately four months.  The

---

[12] Thus, it may very well be that the Court cannot take into account the fact that although the government has relied heavily on evidence that implicates several Congressmen other than Ney, it has not charged any of them in connection with this conspiracy.  *See United States v. Scott*, 631 F.3d 401, 406-07 (7th Cir. 2011) (affirming district court's refusal to consider the lack of charges against co-conspirators).

[13] Similarly, the government is free to ask for a below-Guidelines variance based on the § 3553(a) sentencing factors.

[14] Abramoff's offense level was driven primarily by the fraud and tax evasion charges against him rather than by the public corruption offenses.  (*See* Appendix A at 2.)

government's leniency toward Volz thereby reduced his sentence by at least 85 percent—again, in a manner explicitly permitted by the Guidelines.

The government's argument that it has unlimited freedom to afford "leniency" to those who plead guilty and that this does not amount to a penalty for the exercise of a defendant's constitutional right to stand trial is unpersuasive. For, as even the government admits, what it *cannot* do is "calculate the Guidelines based on whether or not someone went to trial." (Tr. 8/30/11 6:17-18.) Employing a dramatically different methodology for calculating the Guidelines range of those who plead guilty would be a form of "leniency," to be sure, but arguably not permissible under the Guidelines.[15]

If accepted, the government's position would undermine the very purpose of the Guidelines, and give prosecutors even more power over sentencing than is already the case. "Congress enacted the sentencing statutes in major part to achieve greater uniformity in sentencing, *i.e.*, to increase the likelihood that offenders who engage in similar real conduct would receive similar sentences." *Booker*, 543 U.S. at 255 (Remedial Op., Breyer, J.). The Guidelines vindicate this principle in a number of ways. Judges are required and empowered to take into account not only the charges actually brought by the government, but any relevant conduct (including uncharged or acquitted conduct) occurring during the commission of the charged offense as well. U.S.S.G. §1B1.3. In addition, the Guidelines require plea agreements to "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics," *id.* § 6B1.4(a)(1), and forbid parties from "stipulat[ing] to misleading or non-existent facts" in plea agreements, "even when both parties are willing to assume the existence of

---

[15] For example, in *Carter*, which the government relies upon (*see* Dkt. No. 260 at 3), the 9th Circuit rejected a defendant's claim of unwarranted disparity in the *ultimate sentence*, not in the fundamental methodology used to calculate the Guidelines range. 560 F.3d at 1121.

such 'facts' for purposes of the litigation." *Id.* § 6B1.4 cmt.; *accord id.* § 6B1.4(a)(2)

(stipulations of fact accompanying plea agreements "shall . . . not contain misleading facts").

Arguably, this system does not permit the calculation of offense levels using one methodology

for defendants who plead guilty, but a dramatically different one for the "only lobbyist who went

to trial and chose not to plead guilty and cooperate with the United States." (Tr. 8/30/11 5:21-

22.) For to do so raises the specter that a defendant has been impermissibly retaliated against for

exercising his constitutional right to stand trial. *See Mazzaferro*, 865 F.2d at 460 ("The law is

clear beyond peradventure that a sentence based on retaliation for exercising the constitutional

right to stand trial is invalid."); *United States v. Rolfsema*, 468 F.3d 75, 79 (1st Cir. 2006)

("[T]he Government may not vindictively seek to raise a defendant's sentence solely because of

that defendant's exercise of a constitutional right."); *Carter*, 460 F.3d at 1121 (government may

afford leniency to those who enter pleas "so long as there is no indication the defendant has been

retaliated against for exercising a constitutional right").

But, as explained herein, the Court need not decide whether the granting leniency in this

fashion represents an unconstitutional burden on defendant's right to trial by jury. Since the

hearing before the Court, the government has somewhat retreated from what one might view as

an absolutist position, and now argues that Ring is dissimilar from his co-conspirators "both

factually and legally." (Dkt. No. 274 at 6-7.) Specifically, the government argues that between

the time the plea agreements were signed with Ring's co-conspirators (late 2005 through 2009)

and now, there have been significant changes both in the controlling law, *see United States v.*

*Skilling*, 130 S. Ct. 2896 (2010), as well as in the relevant facts learned by the government over the course of the investigation.[16]

Defendant appears to agree that a material change in the law or facts would justify a change in sentencing methodology. (*See* Tr. 8/30/11 33:17-34:3 ("[T]o the extent that the government learns new facts, . . . then that might be an appropriate reasons to change the Guidelines calculation. To the extent that the government—the government learns of new authority, like *Skilling* that fundamentally changes the calculus, that might be an appropriate ground to vary the guideline calculation.")). Ring disagrees, however, with the suggestion that the government's prior "sentencing calculations were based on a universe of information that did not include the issues that drive its [current] position." (Dkt. No. 272 at 5.)

Ring argues that the government was free to advocate in favor of the bribery cross-reference for Albaugh, who the government argued had breached his plea agreement and whose sentence occurred post-*Skilling*. (Dkt. No. 258 at 2-3; Dkt. No. 274 at 5.) The fact that it did not, according to defendant, belies the government's claim that it has changed its sentencing methodology due to the *Skilling* decision. Likewise, Ring notes that the government did not seek to enhance Albaugh's sentence pursuant to §2C1.1(b)(2)(A) by referencing the total amount of appropriations sought by Ring, despite the fact that these amounts were known to the government at that time and specified in the factual basis for Albaugh's plea. (*See* Albaugh Factual Proffer ¶12(i).) In addition, defendant contends that the government was aware of all

---

[16] The government's additional justifications for altering its Guidelines methodology are unavailing. (*See* Dkt. No 274 at 6-7.) As noted herein, the fact that "Ring was convicted of more and different charges" than his co-conspirators plays no role in calculating the Guidelines range. (*See supra* note 10.) Furthermore, the fact that the government is limited by contract principles from revising its sentencing position with regard to Ring's co-conspirators is beside the point—the only issue is what the government knew and the positions it took at the time it entered into the plea agreements, not at the time of sentencing.

relevant facts at least by the time Abramoff was sentenced in August 2008, when it stated to the Court that it remained "confident that [Abramoff's] plea agreement and factual basis reflect substantially all of the fraudulent conduct which we have found Abramoff to have engaged in." *United States v. Abramoff*, 06-001 (D.D.C. Aug. 27, 2008), Dkt. No. 33 at 9.

## A. Change in Law

The first issue is simple to resolve: the law surrounding honest services fraud changed dramatically in June 2010 when the Supreme Court decided *Skilling*. (*See infra* Part II.A.) This change in the law justifies the use of the §2C1.1 cross-reference, as well as the decision by the government to argue in favor of the 20-level "value of the benefits received" enhancement previously unavailable to it under §2C1.7.[17]

The fact that the government did not adopt this position during Albaugh's sentencing is of no moment, given that the government had agreed pre-*Skilling* to a sentencing calculation pursuant to §2C1.7 in Albaugh's plea. Nor was the government, as Ring contends, "releas[ed] from the constraints of th[is] agreement's preliminary guidelines calculations." (Dkt. No. 272 at 5.) At sentencing, the government argued only that Albaugh failed to meet his obligations pursuant to paragraph 8(b)(ii)-(iv) of the Plea Agreement by "challenging the adequacy or sufficiency of the United States' offer of proof" against him, "den[ying] involvement in the

---

[17] Even if the government had previously applied §2C1.1 to Albaugh, it remains unclear whether it would have been able to use the "Conference Hopes and Demands" appropriations to enhance his sentence as "benefits received" in exchange for bribes. (*See* Albaugh Factual Proffer ¶ 12(i) (quoting GX KR 158).) The government maintains that at the time Albaugh pled guilty, it "did not yet understand" that these four requests "would have been eliminated but for the relationship with Mr. Ring." (Tr. 8/30/11 13:2-4.) It bears noting, however, that after the first trial, Albaugh "recanted" his testimony regarding causation and told the government that he "believed that the role of the meals and tickets in his assistance to Mr. Ring was less than what he had previously testified" and that "that if Mr. Ring had provided only campaign contributions and not the meals and tickets, that he likely would have taken the same official actions." (Dkt. No. 187 at Ex. A.) As a result, he did not appear as a witness at the second trial, and at his sentencing, the government argued against granting him any reduction for acceptance of responsibility.

13

offense," and by "giv[ing] conflicting statements about [his] involvement."  (*See supra* note 17.)

These actions allowed the government to oppose any adjustment for acceptance of responsibility

*under the terms of the plea agreement itself.*  The government at no time challenged the validity

of the remainder of Albaugh's plea agreement.

### B.    Change in Facts

The government's second argument is highly relevant to its decision to argue in the

alternative for a 16-level enhancement for defendant based on the value of the bribes, rather than

employing the 8-level elected-official enhancement it had so consistently utilized in the past.

(*See supra* Part I; Attachment A).  Because the Court must use the greater of the two

enhancements, prior representations by the government that the 8-level elected-official

enhancement applied or was "greater than any adjustment which might otherwise have applied

based on value under §2C1.7(b)(1)(A)" (*see* Albaugh Plea Agreement ¶ 8(a); Boulanger Plea

Agreement ¶ 9(a)), necessarily mean that the government once believed the ascertainable value

of corrupt payments in this conspiracy totaled less than $120,000.[18]  *See* U.S.S.G. §§

2C1.7(b)(1)(A) & 2B1.1(b)(1).  As noted above, the government used this calculation for Ney,

Heaton, Zachares, Albaugh, and *all* of the lobbyist defendants, including most notably Scanlon

and Abramoff.  Moreover, the government has relied on the elected-official enhancement as

recently as January 2009, when it entered into a plea agreement with Todd Boulanger. Only now,

after trying Mr. Ring on two occasions, does the government claim to have estimated the amount

of corrupt payments, arriving at a total value exceeding $1 million.  The practical effect of this

change is an 8-level increase in Ring's offense level, resulting in a Guidelines range (excluding

_____

[18] Despite the fact that the government alleges that Boulanger, Rudy, Volz, and Ring were all
Greenberg Traurig lobbyists involved in the same conspiracy to corrupt public officials, it made
no effort to aggregate the things of value given to public officials by Boulanger Volz, or Rudy,
reserving such a calculation for Ring alone.  (*See* Attachment A.)

role in the offense and obstruction enhancements) that is more than six years longer than would be the case if the 8-level increase were to be applied.

The fact that the government may properly take into account new facts it has learned in the years since Ring's co-conspirators plead guilty does not mean that it may engage in *fact bargaining*. As previously explained, the Guidelines provide prosecutors with ample tools to afford leniency to those who have demonstrated the attributes on which leniency is based. *See Carter*, 560 F.3d at 1120-21. The government may not, however, mislead the court, even if it has promised a defendant it will do so as a reward for pleading guilty or for cooperation.

Our system of sentencing is in part designed to ensure that sentences are based upon "the *real conduct* that underlies the crime of conviction." *Booker*, 543 U.S. at 250 (Remedial Op., Breyer, J.). "One of the principal reasons for this, as expressed by the Court, is to prevent prosecutors, when they make charging decisions, from 'exercis[ing] a power the Sentencing Act vested in judges.'" *United States v. Stewart*, 590 F.3d 93, 161 n.13 (2d Cir. 2009) (Calabresi, J. concurring) (quoting *Booker* at 257). Plea agreements must therefore "set forth the relevant facts and circumstances of the actual offense conduct and offender characteristics" and may "not contain misleading facts." U.S.S.G. §6B1.4(a)(1), (2). The end result is that under the Guidelines, prosecutors therefore may not "swallow the gun"—that is, "hide[] evidence from the sentencing judge if defendant pleads guilty but regurgitate[] it where the plea deal f[alls] through." *United States v. West*, 552 F. Supp. 2d 74, 77 (D. Mass. 2008); *accord United States v. Salazar*, 983 F.2d 778, 784 (7th Cir. 1993). Even where §1B1.8[19] applies, and the government

---

[19] "Where a defendant agrees to cooperate with the government by providing information concerning unlawful activities of others, and as part of that cooperation agreement the government agrees that self-incriminating information provided pursuant to the agreement will not be used against the defendant, then such information shall not be used in determining the applicable Guidelines range, except to the extent provided in the agreement."

is thereby permitted under the Guidelines to advocate for a sentence based on "facts" that do not capture a defendant's true offense conduct, "[t]his provision does not authorize the government to withhold information from the court." §1B1.8 cmt. n.1. Others have noted, however, that while the Guidelines may proscribe fact bargaining, they do not prevent it in practice. *See Booker*, 543 U.S. at 290 (Remedial Dissent, Scalia, J.) ("[T]he premise on which the Court's argument is based—that the guidelines as currently written prevent fact bargaining and therefore diminish prosecutorial power—is probably not correct. As one commentator has noted: '[P]rosecutors exercise nearly as much control when guidelines tie sentences to so-called 'real-offense' factors . . . . One might reasonably assume those factors are outside of prosecutors' control, but experience with the Federal Sentencing Guidelines suggests otherwise; when necessary, the litigants simply bargain about what facts will (and won't) form the basis for sentencing.'" (quoting Stuntz, *Plea Bargaining and Criminal Law's Disappearing Shadow*, 117 Harv. L. Rev. 2548, 2559-2560 (2004) (omission in original).).[20]

Ultimately, however, attempting to resolve the question of precisely what facts the prosecutors knew at the time of the plea raises serious separation-of-powers and prosecutorial discretion concerns. *See, e.g.*, *Scott*, 631 F.3d at 406-07. Moreover, such an exercise would pose challenging evidentiary issues given the number of prosecutors and defendants involved in this conspiracy. In criminal cases involving plea agreements, the Court and the probation office are frequently at the mercy of the parties to disclose and explain the relevant facts. As a result, the Court may not always get a full picture of the defendant's offense conduct, nor does it have

---

[20] To be clear, the prosecutors do not concede that they "swallowed the bribes," but rather they assert that, when they entered into plea agreements with Ring's co-defenders as early as 2005, they did not have a complete picture of the scope and nature of the public corruption scheme, and therefore "the facts that are known to the parties and the Court in 2011[] are different than those when the co-conspirator[s'] plea agreements were reached." (Dkt. No. 260 at 2.)

the means to learn the information on its own.[21]  Also, assuming that such a delicate exercise

could be conducted, and the Court could somehow determine that the government had failed to

disclose relevant information in the plea agreements or sentencing memoranda of Ring's co-

conspirators, such a conclusion arguably would serve only to identify weaknesses in the

Guidelines calculations for *prior* sentences. *See United States v. Yeje-Cabrera*, 430 F.3d 1, 27

(1st Cir. 2005) (The Guidelines "provide[] no justification for a court to sentence a defendant on

any basis other than the facts before it, much less [do they] provide a justification for a court to

disregard the facts before it as a 'remedy' for the government's earlier failure to provide all the

facts.").

But, as will be clear from Part II.C, *infra*, the Court need not decide these difficult and

troubling issues.  First, as explained herein, the Court concludes that the 8-level enhancement for

offenses involving an elected or high-level decision-making official is the correct method for

determining "loss," due to the failure of the government to sustain its burden for either a 20-level

"value of benefits received" enhancement or a 16-level "value of the bribes" enhancement.

Second, even if the Court could validly consider disparity among convicted co-conspirators at

the Guideline calculation stage, it is not necessary to do so since even the government concedes

that such disparity is among the permissible factors that may be considered under 18 U.S.C. §

3553(a).  (Dkt. No. 274 at 3-4.)  *See United States v. Martinez*, 610 F.3d 1216, 1228 (10th Cir.

2010) ("[A]lthough § 3553(a) does not require a consideration of co-defendant disparity, . . . it is

---

[21] This Court can recall only once prior instance in twelve years where a probation officer
recommended a materially different Guideline calculation than that agreed to by the parties.  *See
also* Remarks of Judge Patti B. Saris, *quoted in* Wendy L. Pfaffenbach, *Federal Judges Reveal
Tips on Evidence*, Mass. Law Wkly., Mar. 19, 2001 at B12 ("Sometimes the government and
defendant have reached a plea agreement and probation disagrees with both the defendant and
the government.  In this situation, if I hold a [sentencing] hearing, it's an awkward
proceeding . . . .").

not improper for a district court to undertake such a comparison . . . .") (citations omitted);

*United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) ("Under the advisory Guidelines scheme

explicated in *Booker*, it is appropriate for a district court, relying on its unique knowledge of the

totality of circumstances of a crime and its participants, to impose a sentence that would better

reflect the extent to which the participants in a crime are similarly (or dissimilarly) situated and

tailor the sentences accordingly."); *United States v. Lazenby*, 439 F.3d 928, 934 (8th Cir. 2006)

(extreme disparity among co-defendants fails to serve the legislative intent reflected in

§ 3553(a)(6)).  Thus, it is a subject that can be addressed more fully with respect to the final

sentence.

Finally, the Court notes that the government could easily have avoided much of this

dispute by recommending that the Court apply the Guidelines in a manner consistent with Ring's

co-defendants.  A remarkably similar situation arose just last month in *United States v. DiMasi*.

Salvatore F. Dimasi, the former Speaker of the Massachusetts House of Representatives, was

convicted earlier this year of receiving a stream of bribes and kickbacks in exchange for official

acts.  DiMasi's co-defendant pled guilty before trial, and in his plea agreement the government

took the position that the Court should measure "value" under §2C1.1(b)(2) by looking to the

value of the bribes and kickbacks ($915,000).  In its sentencing memorandum filed just last

month in DiMasi's case, the government recognized that the correct measure of "value" under

the Guidelines was actually the "benefit received" in exchange for the bribes ($3,691,000).

Despite this fact, the government urged the Court to use the lower value of the bribes and

kickbacks "for the sake of fairness and consistency" with his co-defendant and "to avoid

unwarranted sentencing disparities . . . as guided by 18 U.S.C. § 3553(a)(6)."  Dkt. No. 625 at 7-

8, *United States v. DiMasi*, No. 09-cr-10166 (D. Mass. Aug. 24, 2011).

Since the Court does not rely on defendant's argument that the government is bound to calculate the Guidelines range consistent with the methodology it has previously used for the co-conspirators who entered pleas, it will now address the specific disputes over the calculation of defendant's Guidelines sentence.

## II.     BRIBERY - §2C1.1

### A.     Application of Bribery Cross-Reference

Defendant was convicted of three counts of honest services fraud (as well as one count of conspiracy to commit honest services fraud). The applicable provision under the 2003 Guidelines for honest services fraud is U.S.S.G. §2C1.7 (Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials; Conspiracy to Defraud by Interference with Governmental Functions). The government argues, however, that the Court should apply the cross-reference at §2C1.7(c)(4),[22] and thereby apply the offence guideline for bribery—§2C1.1. The Guidelines relating to honest services fraud and to bribery are similar in a number of respects—both have a base offense level of 10, with enhancements based on the greater of 1) loss to the government, 2) the amount of the bribes or corrupt payments, or 3) whether the offense involved an elected or high-level decision-making official. *Compare* §2C1.1(a), (b)(2) *with* §2C1.7(a), (b)(1). The bribery provision, however, contains two significant differences: 1) an additional 2-level increase where the offense "involved more than one bribe or extortion," §2C1.1(b)(1), and 2) the availability of an alternative enhancement based on "the value of . . . the benefit received or to be received in return for the payment," §2C1.1(b)(2)(A). For Ring, these differences are significant: by the government's calculation,

_____

[22] U.S.S.G. §2C1.7(c)(4) states: "If the offense is covered more specifically under §2C1.1 (Offering, Giving, Soliciting, or Receiving a Bribe; Extortion Under Color of Official Right), §2C1.2 (Offering, Giving, Soliciting, or Receiving a Gratuity), or §2C1.3 (Conflict of Interest), apply the offense guideline that most specifically covers the offense."

the §2C1.1 cross-reference would increase defendant's total offense level from 31 to 37,[23] which corresponds to a nine-year increase in the Guidelines range.

Defendant contends that the cross-reference in §2C1.7(c)(4) applies "on its face" only "to public corruption cases in which the government has charged multiple offenses in separate counts," including the scenario when "a jury convicts of honest services fraud *and* bribery." (Dkt. No. 258 at 6.)  Thus, defendant argues that the cross-reference does not apply here because the government did not charge, nor did the jury convict, Ring with violating a bribery statute (18 U.S.C. §§ 201 or 666).  (*Id.* at 6-7.)  This is not how multiple offenses are accounted for by the Guidelines.  Where there are multiple counts of conviction, the Court determines the base offense level, specific offense characteristics, cross references, and role adjustments for each count of conviction (including relevant conduct) separately.  §1B1.1(a)-(c).  After this calculation has been made, the Court "[a]ppl[ies] Part D of Chapter Three to group the various counts and adjust the offense level accordingly."  §1B1.1(d).  Were a defendant convicted of both honest services fraud and bribery, the two offenses would in all likelihood be aggregated in accordance with §3D1.2(d), rendering the §2C1.7(c)(4) cross-reference unnecessary.  There is simply no way to read the bribery cross-reference, which applies "[i]f the offense is covered more specifically under §2C1.1," as being triggered based on the government's decision to charge substantive bribery in addition to honest services fraud.[24]

---

[23] In addition to the 2-level multiple bribe enhancement, §2C1.1 allows the government to seek a 20-level increase for "benefits received" instead of being limited to what it contends is a 16-level enhancement based on the amount of the bribes.

[24] The fact that the Commentary following §2C1.1 lists the bribery and extortion statutes, but not the honest services fraud statute, does not alter this analysis.  The Guidelines Manual is explicit that "[t]he list of 'Statutory Provisions' in the Commentary to each offense guideline does not necessarily include every statute covered by that guideline.  In addition, some statutes may be covered by more than one guideline."  §1B1.1 cmt. n.3.

Instead, under §2C1.7(c)(4) the Court must examine a defendant's *offense conduct* and determine whether the offense is more specifically "covered" under §2C1.1 (bribery) or §2C1.7 (honest services fraud). Where a defendant's honest services scheme "essentially involve[s]" bribery, then the cross-reference is appropriate. *United States v. Hasner*, 340 F.3d 1261, 1276 (11th Cir. 2003) (per curiam) (upholding application of cross-reference to §2C1.3 (conflict of interest) where "the offenses at issue essentially involve [defendant's] failure to disclose his conflicts of interest"). Where, however, a defendant's scheme is comprised of multiple dissimilar acts and there is therefore "more to [the defendant's] scheme" than bribery, the cross-reference is inappropriate. *United States v. Jennings*, 487 F.3d 564, 588 (8th Cir. 2007) (upholding district court's decision not to apply cross-reference to §2C1.3 where defendant's offense conduct included not only nondisclosure of his conflict of interest, but also "us[ing] his position to influence his colleagues and members of the utility industry for personal gain," lying, and "fabricat[ing] documents"); *United States v. Grandmaison*, 77 F.3d 555, 567 (1st Cir. 1996) (cross-reference to §2C1.3 not applied where, in addition to failing to disclose his conflict of interest, defendant "secretly delivered gratuities to [three board members] to secure favorable votes").

Ring argues that the application of §2C1.1 would be inconsistent with the treatment of those co-conspirators who have been charged and sentenced in connection with the same scheme to defraud. In particular, he notes that the government has not previously advocated for the use of the cross-reference for Volz, Rudy, Boulanger, Ney, Heaton, Zachares, Albaugh or Copland,

either in their plea agreements or at sentencing, instead choosing to calculate the Guidelines range based on §2C1.7.[25]

As previously alluded to, however, this inconsistency is explained by the fact that the applicable law has changed since the time that each of those co-conspirators entered their plea agreements. Ring's co-conspirators each "pleaded guilty to honest services fraud that contemplated both bribery and undisclosed conflicts of interest." Consequently, each of these co-defendants pled guilty to "conduct that violated both bribery honest services fraud and undisclosed conflict of interest honest services fraud." (Dkt. No. 260 at 6-7.) As there was "more to these schemes" than merely bribery, the bribery cross-reference would not be applicable, leaving §2C1.7 as the correct guideline provision.

Ring, however, went to trial after the Supreme Court's ruling in *Skilling*. That case limited the scope of honest services fraud to bribery or kickback schemes and rejected the government's argument that 18 U.S.C. § 1346 could also permissibly proscribe "undisclosed self-dealing." As a result, the government was required to prove a *bribery* scheme in order to obtain a conviction for honest services fraud, and the jury was specifically instructed that, on the facts of this case, "the only type of scheme that the honest services fraud law forbids is a scheme to deprive the public of its right to honest services through bribery."[26] (Final Jury Instruction No.

---

[25] The government applied §2C1.1 to Scanlon and Abramoff, although this appears to have been due to the fact that both were also convicted of conspiracy to commit bribery. In any event, §2C1.1 had little impact on sentencing for either defendant, as their total offense levels were driven primarily by the separate fraud charges that stemmed from the "Gimme Five" kickback scheme to defraud the Indian tribes who were clients of Abramoff and Scanlon of millions of dollars. As for Abramoff, the loss to the Indians was calculated under his plea agreement to be $25,000,000 and as for Scanlon, the loss to the Indian tribes was calculated at between $7 million and $20 million.

[26] The government's repeated assertion, however, that the U.S. Sentencing Commission deleted §2C1.7 and merged it with §2C1.1 because of the Supreme Court's ruling in *Skilling* is incorrect. (Dkt. No. 257 at 3 n.2; Tr. 8/30/11 19:16-18, 20:4-11.) The Commission made this change in

42.) *See United States v. Bryan*t, 2011 U.S. App. LEXIS 17753, at *23-30 (3d Cir. Aug. 25, 2011) ("*Skilling* did not eliminate from the definition of honest services fraud any particular type of bribery, but simply eliminated honest services fraud theories that go beyond bribery and kickbacks"); *United States v. Urciuoli*, 613 F.3d 11, 13-14, 17-18 (1st Cir. 2010) (same). Ring's offense conduct therefore differs from that agreed to by his co-conspirators, in that it does not include any failure to disclose a conflict of interest. As a result, Ring's honest services fraud "essentially involved bribery," *Hasner*, 340 F.3d at 1276, and is therefore "covered more specifically under §2C1.1." U.S.S.G. §2C1.7(c)(4).

As a result, the Court will apply the bribery cross-reference, §2C1.7(c)(4) and the bribery guideline in §2C1.1 to Ring's offense conduct.

### B.  Enhancement for "More than One Bribe" Under §2C1.1(b)(1)

Given the applicability of §2C1.1, the base offense level of 10 for bribery is enhanced by 2 levels where "the offense involved more than one bribe." §2C1.1(b)(1). The Application Notes, however, state that "[r]elated payments that, in essence, constitute a single incident of bribery or extortion (e.g., a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." §2C1.1 cmt. n.6.

Invoking this exception, Ring argues that the multiple bribe enhancement should not apply because the government proceeded to trial on a "stream of benefits" theory, charging Ring with numerous counts that together were part of a "single scheme to defraud" the public of the honest services of public officials.

---

2004—six years prior to *Skilling*—in order to "simplify guideline application." *See* U.S.S.G Supplement to Appendix C, amend. 666 (noting that the effective date of this amendment was November 1, 2004).

The Court rejects this argument. Section 2C1.1(b)(1) speaks not of multiple "schemes to defraud" but of multiple "bribes," and Ring was both charged and convicted of a scheme to defraud involving *multiple* public officials. This is altogether different from "a number of installment payments for a single action," and there was ample evidence at trial of multiple "incidents" of bribery, targeted at multiple public officials.[27] *See United States v. Kahlon*, 38 F.3d 467, 470 (9th Cir. 1994) (multiple "payments [that] were part of a larger conspiracy" can be the basis for an enhancement under §2C1.1(b)(1), as long as they "were not installment payments for a single action."); *United States v. Arshad*, 239 F.3d 276, 281 (2d Cir. 2001) ("Courts confronted with similar situations have uniformly held that multiple payments meant to influence more than one action should not be merged together for purposes of §2C1.1 merely because they share a single overall goal or are part of a larger conspiracy to enrich a particular defendant or enterprise.")

Accordingly, §2C1.1(b)(1) should be applied, and defendant's offense level is increased by 2 levels.

### C.   Calculation of "Loss" Enhancement Under §2C1.1(b)(2)

Section 2C1.1(b)(2) enhances the offense level for bribery based on the *greatest* of the following calculations:

> (A) If the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense, whichever is greatest (i) exceeded $2,000 but did not exceed $5,000, increase by 1 level; or (ii) exceeded $5,000, increase by the number of levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to that amount.

> (B) If the offense involved a payment for the purpose of

---

[27] The Court further notes that this enhancement was applied to both Scanlon and Abramoff. (*See* Appendix A.)

> influencing an elected official or any official holding a high-level
> decision-making or sensitive position, increase by 8 levels.

Loss calculations "need not be precise," *United States v. Antico*, 275 F.3d 245, 270 (3d Cir. 2001), and the Guidelines require only that the Court "make a reasonable estimate" of these values. §2B1.1 cmt. n.3(C).

The government asserts that the value of the benefits received in exchange for Ring's corrupt payments was over $14 million, triggering an enhancement of 20 levels under §2B1.1(b)(1)(H). In the alternative, the government argues that the value of the corrupt payments exceeds $1 million, triggering a 16-level enhancement under §2B1.1(b)(1)(I). If neither of these enhancements apply, the government maintains that the 8-level "elected official" enhancement, §2C1.1(b)(2)(B) would apply as well. Ring challenges the use of each of these enhancements.

### 1. Calculation of "Benefit Received or to be Received"

The primary measure of "loss" for purposes of §2C1.1(b)(2)(A) is the value of the "benefit received or to be received in return for the payment," as this value is typically larger than the amount of the bribe itself, and the Guidelines instruct the Court to use whichever measure of value is greatest. §2C1.1(b)(2)(A). The government "bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006).

"The value of 'the benefit received or to be received' means the net value of such benefit." §2C1.1 cmt. n.2. Thus, where a defendant pays a bribe in return for being awarded a government contract, the "value of the benefit" is the *profit* made on the contract, not the gross value of the contract. *Id.*; *United States v. Sapoznik*, 161 F.3d 1117, 1118-20 (7th Cir. 1998) (Posner, J.) ("[T]he relevant 'benefit received' is indeed profit (net revenue) and not (gross)

revenue."). Furthermore, it is clear that where an individual pays a bribe on behalf of a client, the relevant "value of the benefit" is the "net value accruing to the entity on whose behalf the individual paid the bribe." *United States v. Cohen*, 171 F.3d 796, 803 (3d Cir. 1999) (citing *United States v. Landers*, 68 F.3d 882, 884 (5th Cir. 1995) (sales representative who paid bribe subject to enhancement based on the net value his employer derived from contracts obtained as a result of the bribe)).[28] Where, by contrast, there is no evidence that the payer of a bribe was acting jointly with or as an agent of a third party, a court may not consider benefit or expected benefit to the unrelated third party under §2C1.1(b)(2). *See United States v. Agostino*, 132 F.3d 1183, 1197 (7th Cir. 1997).

The government asserts that the value of the benefits received in exchange for Ring's corrupt payments was over $14 million. This figure includes 1) the $7.3 million increase in the Department of Justice award for the Choctaw Jail, 2) $4.95 million in transportation earmarks that were funded by the House due to Albaugh's intervention,[29] and 3) $400,000 in appropriations for a water project study assisted by Rep. John Doolittle. (Dkt. No. 257 at 10-13.) While the government's presentation of evidence at trial touched on the Choctaw jail funding, the government spent almost no time at the second trial discussing the Albaugh or Doolittle appropriations it now seeks to use in its benefit calculation. This is clearly permissible, as it is well settled that a sentencing judge may consider not only the conduct that formed the basis of the conviction, but also "relevant conduct." U.S.S.G. §1B1.3(a)(2). Courts have cautioned, however, that "when the benefit calculation is based largely on conduct for which the defendant

---

[28] Under "relevant conduct" principles, the Court must take into account the benefit received by Ring's co-conspirators as well. *See* U.S.S.G. §1B1.3(a)(1)(B).

[29] These earmarks included $1.3 million for the City of Elk Grove, $1.4 million for a road for the Choctaw, $1.25 million for the Hopi Turquoise Trail project, and $1 million for the Agua Caliente. (*See* Dkt. No. 257 at 12.)

was not convicted, the district court must be careful to explain exactly how the conduct factors into the benefit calculus." *United States v. Anderson*, 517 F.3d 953, 963 (7th Cir. 2008) (citing *United States v. Schaefer*, 291 F.3d 932, 938 (7th Cir. 2002)).[30]

Applying this admonition, the Court cannot conclude that the government has sustained its burden of proving by a preponderance of the evidence that a 20-level enhancement is appropriate given the host of problems with these figures. First is the issue of how to determine the "net value accruing" to Ring's clients as a result of these congressional appropriations. According to the government, Ring's clients (Indian tribes and municipalities) received not cash or valuable contracts, but rather a larger jail for the Choctaw than the tribe might otherwise have built, various roads and other transportation projects, and an Army Corps of Engineers study for a future water project for Saipan in the Commonwealth of the Northern Mariana Islands ("CNMI"). Determining even the gross value of these endeavors is a difficult exercise, to say nothing of the difficulty in determining what direct costs must be subtracted to determine the "net value" of these benefits. The government's position is that the net benefit is simply equivalent to the amount of the appropriation. (*See* Tr. 8/30/11 62-67.) But the amount of the appropriation may not necessarily represent the actual cost of these projects, let alone the "benefit" they conferred on the tribes or municipalities, and the government has failed to present any evidence in this regard. Moreover, the evidence demonstrates that the Choctaw were concerned not only with the size of the jail, but also with ensuring that the jail be constructed

_____

[30] In this regard, it is significant that, in addition to the conspiracy count (Count I), Ring was convicted of only four of the eight substantive counts. Two of these counts (Count II and III) are based on the same conduct—giving Robert Coughlin four Wizards tickets with a face value of $77.25 each. With respect to John Albaugh, Ring was convicted only on Count VII, which involved two tickets to a Disney on Ice show at the Verizon Center. Finally, the last count of conviction (Count VIII) involved a $5,000 wire transmission to Julie Doolittle that was part of a $96,000 salary she was paid for her "consulting" job, which, according to the government, was a "little-work job."

under a "sole source" contract, strongly implying that the profits that would flow to the Choctaw's "hand-selected construction company" represented at least some portion of the benefit it wished to derive from the jail.  (Tr. 8/30/11 69:15.)  Again, the government has provided no evidence as to the costs of building the jail and therefore the profits made by the sole-source construction company that built it.

The second major issue with the government's chosen "amount of the benefit received" figures is the attenuated, if not nonexistent, causal link between these appropriations and corrupt lobbying.  As the government correctly notes, the "threshold for establishing a causal connection under §2C1.1(b)(2)(A) is low," *United States v. McNair*, 605 F.3d 1152, 1230 (11th Cir. 2010), and the government need not prove that the bribes were the "but for" cause of the benefit.[31]  *Id.*; *Sapoznik*, 161 F.3d at 1118-19 (government need only show that the bribes "facilitated" the benefit); *United States v. Kinter*, 235 F.3d 192, 198 (4th Cir. 2000) ("The threshold for the causation inquiry for §2C1.1 calculations is relatively low."); *Cohen*, 171 F.3d at 804 (rejecting "but for" causation under analogous commercial bribery Guideline §2B41.1(b)(1)).

"[T]he question of *causation* is different," however, "from the question of *quantification*."  *Sapoznik*, 161 F.3d at 1119 (emphasis added).  The government has presented little to no evidence tying the additional $7.3 million award for the Choctaw jail to any corrupt payments by Ring or his co-conspirators.[32]  While the government has presented evidence suggesting that David Ayres, Attorney General John Ashcroft's chief of staff, received a ticket to

---

[31] *United States v. Whitfield*, 590 F.3d 325 (5th Cir. 2009) did not, as Ring claims, apply a "but for" causation standard (Dkt. No. 272 at 8), but rather dealt with the issue of quantifying the net value of the benefit that unquestionably resulted from bribery.

[32] The government has presented even less evidence connecting Peter Evich's efforts in October 2001 to secure funding for the CNMI study (*see, e.g.*, GX-KR 220), with the tickets he requested nearly a year before in September 2000.  (*See* GX-KR 281).

March Madness approximately a month after the $16.3 million was awarded for the Choctaw jail (*see* GX KR 327 ("glad he got a chance to relax, now he can pay us back")), there is *no* evidence connecting this ticket with the decision to award the additional funding for the jail.  To respond to this problem, the government concedes that this exchange most likely relates to the "resistance from the DOJ bureaucrats and the 'red tape' that held up the no-bid contract" for building the jail.  (Dkt No. 260 at 14.)  The "net benefit" received by the Choctaw might therefore be the difference between a no-bid contract and a competitive contract—and yet, there is no evidence upon which the Court could make such a calculation, nor is there a scintilla of evidence relating to what role, if any, Ayres played in this decision, thereby making it impossible to infer that the March Madness ticket was intended as a bribe, as opposed to an illegal gratuity or merely an attempt to build goodwill.

The government's theory appears to be premised on aggregating the value of any appropriations that can be directly traced to Kevin Ring's lobbying efforts.  But in determining the value of the benefits "received or to be received *in return for the payment*," the Court must take care to take into account benefits that would have been received in any event.  *United States v. Whitfield*, 590 F.3d 325, 368 (5th Cir. 2009) (where trial judge bribed by an attorney, intended loss under §2C1.1(b)(2) is not the amount of the verdict, but rather must be "adjusted by taking into account a reasonable estimate of whatever intrinsic value that case may have had if litigated before an impartial judge").  Similarly, the benefits Ring's clients received from his corrupt lobbying must be compared with what might have happened had there been no *corrupt* lobbying, not, as the government would have it, by looking to what would have happened had there been no lobbying at all.  (*See* Dkt. No. 260 at 10-14.)  This is particularly true given the government's

necessary concession that only some portion of Ring's lobbying was corrupt or improper. (*See, e.g.*, Dkt. No. 257 at 18.)

Finally, and most importantly, the government has made no effort to distinguish between bribes and gratuities when discussing the corrupt payments it claims are connected to benefits to Ring's clients. The distinction is important. Bribery requires the corrupt intent to exchange things of value for official acts, while an illegal gratuity need only be given "for or because of" an official act. The Guidelines reflect this distinction not only with different base offense levels for bribery (10) and illegal gratuities (7), but also by allowing for an enhancement based on "benefit received or to be received" under §2C1.1 (bribery), but *not* under §2C1.2 (illegal gratuities). Consequently, benefits received in connection with an illegal gratuity cannot serve as the basis for a "value of the benefit" enhancement under §2C1.1(b)(2)(A), but the government has never attempted to distinguish the two, choosing instead to merely lump them together under the heading of "corrupt payments."[33]

The Court therefore determines that it cannot arrive at a reasonable estimate of the "value received or to be received" in return for the bribes paid by defendant.

### 2. Calculation of Bribe Value

An alternative method of calculating the §2C1.1(b)(2) enhancement is by determining the value of the corrupt payments themselves. For this calculation, the government lists three types of corrupt payments: $5 million spent on tickets to sports and entertainment events at the MCI Center, FedEx Field, and baseball games used by the co-conspirators during the course of the

---

[33] For example, Ring was convicted of paying an illegal gratuity (Count II) and bribery/honest services fraud (Count III) on the basis of the same activity: providing Coughlin with Wizards tickets in exchange for contacting an INS employee to expedite the visa application of a student at the Eshkol Academy whom Abramoff wanted to bring over from Israel to play basketball at the school.

conspiracy; $500,000 expensed for meals at restaurants (including Signatures, which was owned

by Abramoff); $200,000 spent on travel with public officials; and corrupt payments to Julie

Doolittle ($96,000) and Lisa Rudy ($50,000) in the form of paid "little-work jobs." (Dkt. No.

15-19.)

To begin with, the government's figure for the value of the tickets is clearly too high. As

the government notes (Dkt. No. 257 at 17 n.7), this Court held during Coughlin's sentencing that

the "value" of these tickets is their face (or fair market) value, and not the per-person, per-event

share of the cost to Greenberg Traurig for leasing the suite. Sentencing Hearing, *United States v.

Coughlin*, No. 08-cr-111 (D.D.C. Nov. 24, 2009).[34]  As previously noted at the *Coughlin*

Sentencing, this is the same formulation employed by the Internal Revenue Code, which uses the

face value of non-luxury tickets to define the business expense deduction allowed for a luxury

skybox. *See* I.R.C. § 274(l)(2) ("In the case of a skybox or other private luxury box leased for

more than 1 event, the amount allowable as a deduction under this chapter with respect to such

events shall not exceed the sum of the face value of non-luxury box seat tickets for the seats in

such box covered by the lease.")  In addition, the government's proposed ticket value assumes

incorrectly that ticket recipients received a *pro rata* share of the full value of the suite. But such

recipients did not benefit from the many perks associated with owning or leasing an entire luxury

box. When calculating the value of an in-kind bribe, courts have held the appropriate "value" to

---

[34] At Coughlin's sentencing, the parties disagreed as to whether the value of sporting tickets for
sentencing purposes should be calculated based, as argued by the defendant, on their face value
of $77.25 or, as argued by the government, based on the per-viewing proportion of the total price
paid by Jack Abramoff and Greenberg Traurig for leasing the suite, $437.28. *Compare* Dkt. No.
17 at 10, *Coughlin*, No. 08-cr-111 (Nov, 18, 2009), *with* Dkt. No. 19 at 32 n.120, 35, *Coughlin*,
No. 08-cr-111 (Nov.19, 2009).

employ is value to the *recipient* of the bribe, not the cost to the one who pays the bribe.[35] *United States v. Bohuchot*, 625 F.3d 892, 904-05 (5th Cir. 2010) (evaluating value of bribe as the value "received" by the bribed official).  The alternative would lead to nonsensical results, for example, by allowing an individual who bribes another by giving him a rare signed baseball card worth $50,000 to defend himself by claiming that the "value of the bribe" is merely the 10 cents he paid for it at a garage sale.  Additionally, the Court notes that the trial testimony of Agent LoStrocco that the government now relies upon indicates that the total cost of the tickets was $4.6 million, not $5 million.  (*See* Tr. 11/1/10 AM 78:18-87:25.)

Even setting these issues aside, there is much more fundamental flaw with the government's calculations.  The government freely admits that not all of these expenses were necessarily corrupt (Dkt. No. 257 at 17), but it also resists any attempt to define what exactly is a corrupt payment. (*See, e.g.*, Tr. 8/30/11 73-92.)[36]  For instance, the $5 million allegedly spent on

---

[35] The government's argument that the Court should look to the ticket costs because Ring was in a better position than Coughlin to know these costs (*see* Dkt. No. 257 at 17 n.7) is therefore irrelevant.

[36] Particularly troubling is the government's position that "corrupt payments" includes payments made to "either groom public officials for corruption or to continue the corrupt relations." (Dkt. 257 at 17-18; *see also* Tr. 8/30/11 73-76.).  This position fails to take into account that gifts of meals and tickets to public officials are not necessarily criminal even if they are provided by someone seeking to curry favor or influence.  As the Court instructed the jury:

> It is not illegal to give a thing of value to a public official merely to
> build a reservoir of goodwill that might ultimately affect one or
> more unspecified acts, now or in the future. Offering hospitality to
> a public official through payments for entertainment, sports events,
> and the like would not constitute violations of the illegal gratuities
> or honest services wire fraud statutes if the intent of the defendant
> was simply to cultivate a personal, business, or political friendship.

(Jury Instruction No. 28, Dkt. No. 222 at 30.)  The Second Circuit reached a similar conclusion in *United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007) (Sotomayor, J.), when it affirmed the following instruction:

tickets included not only corrupt gifts, but also in-kind campaign contributions (typically in the form of fundraisers held at box suites); attendance by family, friends, business associates, or the lobbyists themselves; as well as non-corrupt lobbying, cultivation of personal and political relationships, and building a reservoir of goodwill with public officials. Similarly, while the government has provided the total cost of trips to the Super Bowl, Scotland, and Puerto Rico, they make no attempt to subtract the costs associated with the non-public officials who went on these trips, including friends, family, and the lobbyists themselves. (*See* Tr. 8/30/11 84-85.) The government also concedes that the Court must subtract the fair market value of the work done by Julie Doolittle and Lisa Rudy from the payments made to them. (Tr. 8/30/11 87:20-88:4.) But instead of attempting to calculate an evidence-based estimate of what proportion of these things of value were in fact corrupt, the government merely states that "there is not an easy way to calculate what portion of the tickets and expenses were actually used for corrupt purposes" and speculates that it "believes that a range of between $1 million and $2.5 million is appropriate." (Dkt. No. 257 at 19.) When asked to justify this figure, the government merely stated that it represented "less than 20% of the potential corrupt payments," without providing any evidence whatsoever to support its selection of this arbitrary discount factor. (Dkt. No. 260 at 17-19.)

---

> [B]ribery is not proved if the benefit is intended to be, and accepted as simply an effort to buy favor or generalized goodwill from a public official who either has been, is, or may be at some unknown, unspecified later time, be in a position to act favorably on the giver's interests--favorably to the giver's interest. That describes legal lobbying…. Public officials may lawfully receive a campaign contribution, and he or she may also lawfully accept a personal benefit if his or her intent in taking those items is solely to cultivate a relationship with the person or persons who provided them.

*Id.* at 149 (alteration and omission in original).

This is unacceptable.  The Court is mindful that loss calculations "need not be precise," *Antico*, 275 F.3d at 270, and the Guidelines require only that the Court "make a reasonable estimate" of these values.  §2B1.1 cmt. n.3(C).  But the government "bears the burden of supporting its loss calculation with reliable and specific evidence," and it may not simply guess where such evidence is unavailable.  *Gupta*, 463 F.3d at 1200 (While "generally a district court's 'reasonable estimate of the intended loss will be upheld on appeal' . . . such calculation may not be mere speculation.") (quoting *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001); *United States v. Cuti*, No. 08-cr-972, 2011 U.S. Dist. LEXIS 84791, at *12-13 (S.D.N.Y. July 29, 2011) (while the court "need only make a reasonable estimate of the loss, given the available information," it "may not engage . . . in 'pure speculation.'" (internal citation omitted); *United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993)).

Moreover, the government's reliance on *United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007), is misplaced.  (*See* Tr. 8/30/11 78:23-24.)  While *Bras* held that a district court "need only make a reasonable estimate of the loss, given the available information," *Bras*, 483 F.3d at 112, a closer look at the facts of that case reveal the extent of the deficiencies in the government's approach here.  Bras pled guilty mid-trial to overcharging the D.C. Department of Public Works for asphalt used to pave the District streets.  Prior to sentencing, the district court conducted a two-day evidentiary hearing to determine "loss to the government" from Bras's scheme.  The government employed the following methodology:

> For each day that Fort Meyer delivered asphalt to a DPW site, a Fort Meyer foreman would prepare a Daily Report listing the actual amount of asphalt delivered to a particular location. (These should not be confused with the IDRs -- the daily reports prepared by DPW inspectors that included the weights from the false tickets.) Because it was impossible to tell from the face of an asphalt ticket whether it was false, [the government] compared the asphalt totals in the Daily Reports with the totals reflected on the

> asphalt tickets for the same date, contract, and location. When the
> tickets reflected a greater amount of asphalt than the Daily Report,
> thus indicating a fraudulent overstatement, she calculated the
> difference in tons and multiplied that amount by the appropriate
> price per ton to determine the loss.

*Id.* at 110.  At the district court's request, the government went further and recalculated the loss

by excluding any items insufficiently supported by documentary evidence.  *Id.* at 110-11.  Here,

by contrast, the government seeks to increase Ring's Guidelines range by nearly four years (prior

to taking offense role and obstruction into account) by applying an admittedly arbitrary discount

factor to an admittedly inflated gross total.  Such a cavalier approach cannot be squared with the

government's burden of having to prove a "reasonable estimate" of the value of the corrupt

payments, and, therefore, the Court concludes that it cannot reasonably determine the value of

the corrupt payments pursuant to §2C1.1(b)(2)(A).

### 3.    Elected or High-level Official Enhancement

Given that the Court cannot reasonably determine either the value of the corrupt

payments or the benefit received or to be received in return for corrupt payments under

§2C1.1(b)(2)(A), it will turn to the "elected or high-level decision-making official"

enhancement.  This provision provides an eight-level enhancement where "the offense involved

a payment for the purpose of influencing an elected official or any official holding a high-level

decision-making or sensitive position."  §2C1.1(b)(2)(B).

Ring argues that a similar provision—§2C1.7(b)(1)(B)—would not apply to the facts of

this case, were the Court to apply §2C1.7 instead of §2C1.1.  (*See supra* Part II.A.)  Specifically,

Ring argues that under this provision (which applies where the offense "involved" an elected or

high-level decision-making official), the elected or high-level decision-making official must be a

participant in the scheme, and "the eight-point enhancement is reserved for schemes that include a high-level or elected official within its group of involved actors." (Dkt. No. 258 at 20-21.)[37]

Given that the Court is not applying §2C1.7, it is unclear whether Ring similarly objects to the use of §2C1.1(b)(2)(B). Any such objection would be misplaced, however, as §2C1.1(b)(2)(B) explicitly applies where the "payment" is "for the purpose of influencing" an elected official. Ring was charged and convicted of a bribery scheme that sought to influence , *inter alia*, Congressman John Doolittle, and therefore the §2C1.1(b)(2)(B) enhancement applies to defendant's offense conduct. (*See* Dkt. No. 258 at 20-21 (implying that such a formulation would capture defendant's conduct).)

## III. ENHANCEMENTS

### A. Manager or Supervisor Enhancement

The government argues that Ring's sentence should be enhanced  pursuant to §3B1.1(b), which increases the offense level by 3 levels where "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The Application Notes to this section comment that factors "the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over

---

[37] Even if the Court were to apply §2C1.7, Ring's reading of "involved" as essentially being the same as "co-conspirator" is tortured. The Guidelines routinely use the term "involved" to describe the nature of the conduct, not the nature of the defendants or their co-conspirators. *See, e.g.*, §2A1.5 ("If the offense involved the offer or the receipt of anything of pecuniary value"); §2A2.2 ("If the assault involved more than minimal planning"); §2A2.3 ("if the conduct involved physical contact"). Indeed, Ring's construction would mean that the 2-level enhancement in §2B1.1 (where "the offense involved 10 or more victims") would apply only where those victims participated in the scheme themselves.

others" in applying this provision. §3B1.1 cmt. n.4.

While admitting to a managerial or supervisory role within the overall lobbying practice at Greenberg Traurig (Dkt. No. 258 at 23-24), Ring argues that the evidence was insufficient to demonstrate a managerial or supervisory role over the *criminal* lobbying activity.

The evidence at trial, however, demonstrated that Ring was the so-called "Chief Operating Officer" of the lobbyists who worked for Jack Abramoff. (Tr. 10/25/10 a.m. 56:8-19.) Ring was the client manager for a number of the lobbying team's clients, including the Choctaw, E-Lottery, and the CNMI, and consequently signed off on the expense reports detailing the corrupt gifts to public officials by Neil Volz and Todd Boulanger. (Tr. 10/28/10 p.m. 62:24-63:18.) In addition, the government charges that Ring cultivated a number of public officials (including Robert Coughlin, David Lopez, and Jennifer Farley) as "champions," thereby recruiting them into the conspiracy. (*See* Dkt. No. 257 at 22; Tr. 10/28/10 p.m. 32:20-33:18.)

Ring's argues that the government's "theory that a team of young lobbyists learned corrupt lobbying from Jack Abramoff" is inconsistent with its suggestion today that Ring was a manager or organizer of the criminal activity of others. (Dkt. No. 258 at 25.) Abramoff received a 4-level enhancement in consideration of his role as the "organizer or leader" of the conspiracy. But this fact in no way precludes the Court from enhancing defendant's offense level based on the lower "manager or supervisor" provision. Indeed, "there can be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." §3B1.1 cmt. n.4.

Based on the evidence presented at trial, the Court concludes that Ring had an "active supervisory role in the actual criminal conduct of others," *United States v. DeGovanni*, 104 F.3d 43, 46 (3d Cir. 1997), and therefore, he qualifies for the 3-level "manager or supervisor" enhancement.

## B.    Obstruction of Justice

The government asserts that Ring's sentence should be enhanced for obstructing justice, pursuant to §3C1.1, which states:

> If: (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

Application Note 4 to §3C1.1 sets forth a non-exhaustive list of "examples of the types of conduct to which this adjustment applies," which includes "other conduct prohibited by obstruction of justice provisions under Title 18, United States Code." §3C1.1 cmt. n.4(i).

The government charges that Ring made false statements to Henry Schuelke and another private attorney and investigators hired by Greenberg Traurig, and that these statements are sufficient to prove, by a preponderance of the evidence, that Ring intended to obstruct justice. Specifically, the government points to Ring's "false and misleading statements about his knowledge of and participation in the [Michael] Scanlon-Abramoff kickback scheme, his receipt of $135,000 related to the Sandia Pueblo [tribe], as well as his knowledge [of] the corruption scheme involving payments to Julie Doolittle for a little-work job." (Dkt. No. 257 at 25.)

Ring admittedly made false statements to Schuelke regarding his knowledge of the Abramoff-Scanlon "Gimme Five" kickback scheme and the circumstances surrounding his receipt of $135,000 from Abramoff and Scanlon. (*See* GX-OKR 184, 185.) Even if the Court were to assume, however, that Ring's actions "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," §3C1.1(A), the obstruction enhancement is not triggered unless Ring's obstructive conduct "related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense." §3C1.1(B). As the Court has

previously held, the Scanlon-Abramoff kickback scheme (and Ring's receipt of $135,000 in connection with these kickbacks) is not the same scheme or transaction as the public corruption scheme Ring was tried and convicted of.  Indeed, it was for this very reason that the Court severed Counts IX and X, which charged defendant with obstruction of justice based on this same conduct.  (*See* Tr. 6/26/09 64:20-21 ("it's not the same scheme or transaction"); *id.* 65:1-2, 10-11 ("I think it's completely unrelated to what this case is about. . . . whether or not the billings of Greenberg Traurig were fair, not fair, true, not true . . . has nothing to do with honest services."))  Indeed, the government now concedes that "Ring's false and misleading statements about his receipt of kickbacks may not be best handled under the §3C1.1 obstruction enhancement."  (Dkt. No. 274 at 5.)

By contrast, had Ring obstructed justice by lying about the "little-work job" for Julie Doolittle, such conduct obviously would relate to the offense of conviction since Ring's conviction on Count VIII involved a wire transfer of monies to Julie Doolittle.  Here, however, the government has not met its burden of proving obstruction.

"An enhancement under §3C1.1 'is only appropriate where the defendant acts with the intent to obstruct justice.'  Where conduct is 'directly and inherently obstructive'—that is, where the defendant engages in 'behavior that a rational person would expect to obstruct justice'—the court may infer an intent to obstruct justice and need not make a separate finding of specific intent."  *United States v. Reeves*, 586 F.3d 20, 23 (D.C. Cir. 2009) (quoting *United States v. Henry*, 557 F.3d 642, 646, (D.C. Cir. 2009)). The government asserts that Ring obstructed justice by "deny[ing] [that he] remember[ed] much about the corrupt job for Julie Doolittle" during the fourth interview with Schuelke  (Dkt. No. 257 at 26), as demonstrated by the fact that during the fifth interview, "Ring provided additional information regarding his knowledge of the payments

to Julie Doolittle and that, unlike what he had said in previous interviews, he had spoken with

David Lopez about his concerns." (*Id.*)  What the government omits, however, is that Ring was

shown a series of emails about David Lopez and Julie Doolittle immediately prior to his being

questioned about this issue during the fifth interview.  (GX-OKR 185 at 19.)  The fact that Ring

"changed" his story when asked about the Julie Doolittle job from "I don't remember, I need my

recollection refreshed" to later providing additional details after having his recollection refreshed

with contemporaneous emails is plainly not "directly and inherently obstructive" and is

insufficient to demonstrate that Ring lied to Schuelke about this issue or intended to obstruct

justice.  *See* §3C1.1 cmt. n.2 (distinguishing "faulty memory" from a "willful attempt to obstruct

justice").  Indeed, the government essentially recognized the weakness of this "falsehood" at oral

argument:

> [T]he job for Julie Doolittle in terms of the false and misleading
> statements is not nearly as strong as the false and misleading
> statements for the kickback that he received. The government has
> never put forth that it is as strong, and it is unlikely that it would
> have been included as a stand-alone charge.

(Tr. 8/30/11 122:13-19.)  Since Ring's lack of memory as to Julie Doolittle "stand[s] alone," and

it does not constitute obstruction of justice, the Court will not apply the §3C1.1 enhancement.

## IV.    ACCEPTANCE OF RESPONSIBILITY

Finally, Ring argues that the Court should grant a 2-level reduction under §3E1.1 for

acceptance of responsibility, notwithstanding the fact that he has gone to trial and been

convicted.  While "[t]his adjustment is not intended to apply to a defendant who puts the

government to its burden of proof at trial by denying the essential factual elements of guilt, is

convicted, and only then admits guilt and expresses remorse," a defendant's conviction at trial

"does not automatically preclude a defendant from consideration for such a reduction." §3E1.1

cmt. n.2.  "[W]here a defendant goes to trial to assert and preserve issues that do not relate to

factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)," the defendant may, in rare circumstances, still be able to clearly demonstrate an acceptance of responsibility for his criminal conduct sufficient to trigger application of this provision. *Id.* Ring asserts that this is just such a case, and that his "comprehensive cooperation" during thirteen meetings with prosecutors and agents over a period of fourteen months and his "complete candor" during these meetings evidences his acceptance of responsibility. (Dkt. No. 258 at 41.)

The Court disagrees. Ring did not end his cooperation and proceed to trial "to make a "constitutional challenge" to the honest services fraud or illegal-gratuities statute, or to admit the essential elements of his conduct, but "challenge the applicability" of these statutes to his conduct. *See* §3E1.1 cmt. n.2. Nor is it accurate to conclude that, as Ring argues, his "cooperation with the government ended because he refused to adopt the government's *legal* theory." (Dkt. No. 258 at 41 (emphasis added).) Rather, Ring "put the government to its burden of proof at trial by denying [an] essential *factual* element[] of guilt": his own corrupt intent to exchange things of value for official acts by public officials. §3E1.1 cmt. n.2.

The Court therefore denies Ring's request for an acceptance-of-responsibility reduction under §3E1.1.

## CONCLUSION

For the foregoing reasons, the Court's calculation of defendant's Guidelines range is as follows:

Base Offense Level

| | | |
|---|---|---|
| Offering or Giving a Bribe | 2C1.1(a) | 10 |

Specific Offense Characteristics

| | | |
|---|---|---|
| More Than One Bribe | 2C1.1(b)(1) | +2 |
| Elected or High-Level Decision-Making Official | 2C1.1(b)(2)(B) | +8 |

Aggravating Role in the Offense

| | | |
|---|---|---|
| Manager or Supervisor | 3B1.1(b) | +3 |

==========================================================

| | |
|---|---|
| TOTAL | 23 |
| Guidelines Range | 46-57 months |


_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: September 20, 2011